Ben Hurst and Sarah Hurst v. Commissioner. Ben Hurst v. Commissioner.
Hurst v. Commissioner
Docket Nos. 56866, 56867.
United States Tax Court
T.C. Memo 1959-6; 1959 Tax Ct. Memo LEXIS 243; 18 T.C.M. (CCH) 20; T.C.M. (RIA) 59006; January 21, 1959
*243 Held: 1. That respondent was justified in making use of the net worth plus nondeductible expenditures method in reconstructing net income under the circumstances of the instant case. Adjustments and understatements determined for the years in question. 2. That the deficiencies for calendar years 1945-1948, inclusive, are barred by the statute of limitations. 3. That respondent has failed to meet the burden of proving fraud for any of the years in question. Harry A. Morris, Esq., for the petitioners. George E. Van Roekel, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: These consolidated proceedings involve the determination of deficiencies in income tax and additions to tax for fraud under section 293(b), Internal Revenue Code of 1939, as follows: Ben Hurst, Docket No. 56867
Additions to Tax
Year
Deficiency
Sec. 293(b)
1945
$16,773.38
$ 8,386.69
1946
22,658.01
11,329.01
1947
8,456.26
4,228.13
Totals
$47,887.65
$23,943.83
Ben Hurst and Sarah Hurst, Docket No. 56866
1948
$11,689.24
$ 5,844.62
1949
842.60
421.30
1950
9,563.55
4,781.78
Totals
$22,095.39
$11,047.70
The principal issues presented for our consideration are: (1) Whether respondent was justified in making use of *244 the net worth plus expenditures method in reconstructing net income for the taxable years involved; (2) whether and to what extent petitioners understated their net taxable income for the years 1945 through 1950; (3) whether any part of the deficiency determined for each of the years in question was due to fraud with intent to evade tax; and (4) whether assessment and collection of any of the deficiencies determined against petitioners are barred by the statute of limitations. Findings of Fact Part of the facts are stipulated (orally and in writing) and are so found and incorporated by this reference. Background and General Facts Ben and Sarah Hurst, the petitioners herein, are citizens of the United States, residing at 1260 West 71st Terrace, Kansas City, Missouri. For the calendar years 1945, 1946, and 1947, each filed timely individual Federal income tax returns with the then collector of internal revenue for the district of Missouri. For the calendar years 1948, 1949, and 1950, petitioners filed joint Federal income tax returns with the then collector of internal revenue for the district of Missouri. Ben Hurst was born in Russia. When he came to the United States in 1890 he *245 was about one and one-half years old. After the age of eight or nine, when he completed the second grade of school, he received no further formal education. Ben went to work at an early age, working as a butcher in the Chicago Packing House district. In 1909, at the age of about sixteen, he came to Kansas City, Missouri, and opened a pawnshop in rented premises as a sole proprietor. Shortly thereafter he married Sarah (nee Krashin), and they lived in the rear of the store. Petitioners worked long hours tending the pawnshop. Petitioners had five children, three sons and two daughters. Ben also supported his mother and father since beginning his business in 1909 until his father's death in 1932 and his mother's demise in 1944. In addition to earnings from his pawnshop activities beginning in 1909, and during the ensuing years, Ben derived considerable income, part of which he accumulated in the form of cash, from various sources including the purchase and sale of realty, the scrap metal business, and the purchase and sale of loose diamonds, which will be discussed more fully hereinafter. He also received funds through inheritance and the proceeds of life insurance. Findings - Adequacy *246 of Accounting Records and Propriety of Use of Net Worth Method Prior to January 1, 1945, in the operation of the sole proprietorship (Ben Hurst, d/b/a Hurst Jewelry and Loan Company, a pawnshop), a single entry system of bookkeeping was maintained. On January 1, 1945, a complete double entry set of books for Ben's various pawnshop and real estate operations was installed under the supervision of a certified public accountant who, with members of his staff, had previously made an audit. After Ben's business operation was changed to that of a credit jewlery business sometime in 1946 or early 1947, a bookkeeping machine was installed. Thereafter, payments on credit sales were entered through the machine and cash sales were recorded on a cash register. Credit sales accounted for about 90 per cent of the receipts. Monies received, after being checked by employees against the bookkeeping machine and cash register totals, were deposited in the bank. During the years 1945 to 1950, inclusive, a perpetual inventory system was maintained. In addition to the stock control maintained in the store (i.e., all of the merchandise was listed in a ledger book or on ledger cards), an inventory check *247 was taken every 60 to 90 days by Ben's employees and a general inventory was made once every year. In auditing the books of Hurst Diamond Shop during the taxable years involved, no physical inventory of the stock was taken by Ben's accountant, who, however, made test checks of the business stock in trade. In making audits, the accountant did not check Ben's personal bank account, personal cash, or assets not used in his business enterprises. The accountant did not certify his audits. In the latter part of 1952, Revenue Agent Augusta D. Craven and representatives of the Intelligence Division of the Internal Revenue Service began a concurrent examination of petitioners' income tax returns and the books and records of Hurst Diamond Shop (formerly Hurst Jewelry and Loan Company) for the taxable years involved herein. During the course of her investigation, the revenue agent examined the books, records, and cancelled checks of the Hurst Diamond Shop and did not find any evidence of overstatements in substantial amounts of business expenses and deductions claimed on the tax returns. The revenue agent found large amounts of unidentified currency deposits, a substantial part of which was not *248 explained by petitioners' books and records. Respondent's agent attempted to trace said unidentified deposits in the bank accounts of Hurst Diamond Shop, including Ben's personal account, by requesting the deposit slips from the banks, but in many instances was unable to obtain such slips. The unidentified deposits, some of which had been credited to Ben's drawing account on the books of Hurst Diamond Shop, ranged in varying amounts from $200 to $10,000. In instances where the agent was able to ascertain that such unidentified deposits had been realized from the sale of petitioners' property or from the return of funds loaned out by Ben, she eliminated them from her list of unidentified deposits. During the taxable years in question, petitioners owned and operated several business enterprises, including Hurst Diamond Shop, formerly Hurst Jewelry and Loan Company, the Peoples Loan Company, B & S Realty Company and its successor, B & S Realty Corporation. Each of said companies had an account with each of its related or successor companies. In her examination of the books relating to the aforesaid enterprises, the revenue agent was unable to correlate some of the entries in said accounts *249 with the corresponding account of the related company. There were cash transactions and various transfers of merchandise in one company that could not be tied in with the dates or specific amounts in the books of the related company. Also, during her examination of the books of Hurst Diamond Shop, Revenue Agent Craven found a series of entries pertaining to the alleged payment of $8,067.63 to an individual, A. I. Morris, but was unable to obtain any substantiation of the underlying liability for the year in question. In addition, she located certain payments made by the shop on behalf of B & S Realty Company in 1946 and to a general contractor, Akridge, for work performed on the personal residence owned by petitioners, expenditures which were unrelated to the business of the Hurst Diamond Shop. An informal conference was held between the accountant and respondent's agent, and she was shown a list of inventory items of Hurst Diamond Shop which was used in making up the amounts reflected in Ben's tax returns as the total inventory of the business as of a certain date, but she was not shown any pricing or listing of said inventory. When she requested some verification of the inventory, *250 she was told that inventory records, purchase invoices, and sales invoices for the Hurst Diamond Shop were not available, and no explanation for their absence was given to her. Lacking an adequate means of verification, she accepted the inventory figures that appeared on the books and records of said company as correct. During the course of the aforesaid examination of petitioners' books and returns, Ben, his then attorney (who withdrew as counsel prior to the instant trial), his accountant, and special agents of the Intelligence Division had a transcribed conference on July 10, 1953, in the matter of Ben's income tax liability to the United States. Ben, when queried as to the exact amount of cash he had in his possession "at any time," stated that he had in excess of $25,000, but could not recall whether or not he ever had as much as $50,000 in the store safe. In one instance, the accountant, at Ben's direction, eliminated bonds in the amount of $10,000 in setting up the opening balance sheet of Hurst Diamond Shop as of January 1, 1945, because Ben did not want all of his bonds to go into the shop as of that date. Opinion - Use of Net Worth and Expenditures Method On the basis of *251 the foregoing findings, we discuss petitioners' contention that their books and records were adequate as a basis for determining income, and that respondent is for that reason precluded from resorting to the so-called net worth plus nondeductible expenditures method to show substantial understatements of income or as evidence of corrected net income. While, as discussed infra, we do not agree that respondent's right to use the net worth approach is dependent upon some patent defect in the books and records of the taxpayers, we think it clear that, if reasons must be assigned, they are ample in the instant case. During the taxable years involved, petitioners owned and operated several business enterprises (such as the B & S Realty Company and its successor, B & S Realty Corporation), to be discussed infra, and each company had an account on the books of its related or successor company. Many cash transactions of said companies were not explained by their records, and in many instances the revenue agent was unable to find any explanation for the entries and was unable to ascertain the source of a substantial part of the funds used in the businesses. In several instances, the agent found *252 that cash transactions of one company could not be compared with the dates or specific amounts in its related firm, and there were transfers of items which could not be tied in with the entries on the books of the related company. Some transactions reflected in said books were not recorded at the proper time or in the proper manner and petitioners' accountant found it necessary to make "retroactive" adjusting journal entries for some transactions prior to the revenue agent's examination. Bonds in the amount of $10,000 were eliminated by the accountant from the opening balance sheet of Hurst Diamond Shop as of January 1, 1945, at Ben's direction. The revenue agent testified, and we have no reason to doubt her, that she discovered many inaccuracies in the books and records of Hurst Diamond Shop; that she was unable to verify all of the income and expenses of said company because there were no supporting records (i.e., sales and purchase invoices, ledger cards, and "daily cash returns") to substantiate the entries; and that in some of the taxable years there were unexplained cash deposits in the company's bank account ranging as high as $20,000 to $30,000 a year, which were credited to *253 Ben's drawing account on the company books. In instances where she was able to trace such unidentified deposits to proceeds from the sale of petitioners' personal property or from the return of borrowed funds loaned to patrons of Ben's store, she eliminated them from her list of unidentified deposits. While the aforementioned facts alone do not, per se, establish understatement of income or unreported sales, they are quite suggestive of such possibilities, and are an invitation to an audit or check-up which will bring the facts to light. Under the circumstances, it is our view that the use of the net worth method by the respondent was fully justified as a test of the accuracy of the petitioners' income tax returns and also as evidence of their correct net income. Carmack v. Commissioner, 183 Fed. (2d) 1 (C.A. 5, 1950), affirming a Memorandum Opinion of this Court [8 TCM 582], certiorari denied 340 U.S. 875 (1950); Frank Imburgia, 22 T.C. 1002 (1954). As aforementioned, however, the right of respondent to resort to the net worth method is not dependent on finding first (and without regard to the implications of the net worth computation) that petitioners' books and records were *254 not sufficient to properly reflect income. It is quite possible that even though a taxpayer may have a complete set of books and may employ a method of accounting which is capable of accurately reflecting the taxpayer's income, there may be false or incorrect entries made on his books, such as nonbusiness expenses, excessive credits to drawing accounts, omission of cash receipts, and the like. Under such circumstances, the income determined from the books would not reflect the taxpayer's true income. Unquestionably there are manifold schemes whereby incorrect entries may be recorded in an otherwise complete and adequate set of books, and it may therefore be difficult, if not impossible, to pinpoint the particular entry or entries that are false or erroneous. In Estate of W. D. Bartlett, 22 T.C. 1228 (1954), we held that where the taxpayer presents a set of books and records which appear to be superficially adequate, the so-called net worth method may be resorted to and applied as a technique for disclosing a substantial gap between actual income and reported income, and thereby suggest the untrustworthiness of the books as a whole. In Morris Lipsitz, 21 T.C. 917 (1954), affd. 220 Fed. (2d) 871 *255 (C.A. 4, 1955), certiorari denied 350 U.S. 845 (1955), we said, in part (p. 930): "when the increase in net worth is greater than that reported on a taxpayer's returns or is inconsistent with such books or records as are maintained by him, the net worth method is cogent evidence that there is unreported income or that the books and records are inadequate, inaccurate, or false. It is not correct to say that the use of the net worth method is forbidden where the taxpayer presents books from which income can be computed, for the net worth method itself may provide strong evidence that the books are unreliable. * * *" This view, of course, recognizes that the so-called net worth method is not itself a system of accounting but merely a technique for reconstructing a taxpayer's correct net income, regardless of the method of accounting followed by the taxpayer in keeping his books. By a showing of a substantial increase in net worth in excess of reported income, without reasonable explanation of such discrepancy as being attributable to gifts, inheritances, or other nontaxable receipts, the net worth method furnishes persuasive evidence of unreported income and reflects on the over-all *256 accuracy of income reported on the books and on the returns. Michael Potson, 22 T.C. 912 (1954), affd. sub nom. Bodoglau v. Commissioner, 230 Fed. (2d) 336 (C.A. 7, 1956); Estate of George L. Cury, 23 T.C. 305 (1954); Harry Gleis, 24 T.C. 941 (1955), affd. 245 Fed. (2d) 237 (C.A. 6, 1957). In this connection, the Supreme Court said, in part, in Holland v. United States, 348 U.S. 121 (1954), rehearing denied 348 U.S. 932 (1955), at p. 131: "The net worth technique, as used in this case, is not a method of accounting different from the one employed by defendants. It is not a method of accounting at all, except insofar as it calls upon taxpayers to account for their unexplained income. Petitioners' accounting system was appropriate for their business purposes; and, admittedly, the Government did not detect any specific false entries therein. Nevertheless, if we believe the Government's evidence, as the jury did, we must conclude that the defendants' books were more consistent than truthful, and that many items of income had disappeared before they had even reached the recording stage. Certainly Congress never intended to make § 41 a set of blinders which prevents the Government *257 from looking beyond the self-serving declarations in a taxpayer's books. * * *" We need not, therefore, restrict the use of the net worth method here to finding particular inaccuracies, omissions, or defalcations in the taxpayers' books. Such may or may not exist and may or may not be discernible. Nevertheless, those which we have pointed out in the instant case supra add significance to the need of using the net worth method. Under all of the circumstances in the instant case, we have no doubt that resort to the net worth and expenditure basis was appropriate. Schedules A to J, Inclusive Note: For an understandable presentation of the issues of fact and law to be considered infra, it is essential, at this point, to set forth the following schedules: A and B - Respondent's computations of increase in net worth for the years 1945 to 1947, inclusive (Schedule A), and for the years 1948 to 1950, inclusive (Schedule B). (Uncontested items indicated by the letter (u).) C and D - Respondent's computations of increase in net worth of Hurst Diamond Shop for the same periods reflecting the capital accounts of Ben Hurst which are included in Schedules A and B above. (Uncontested items indicated *258 by the letter (u).) E and F - Respondent's computations of adjusted gross income of petitioners for the same periods. G - Our revision of increases in net worth for the same periods. (Contested items indicated by the letter (c). Items without designation are either stipulated or uncontested.) H - Our revision of net worth of Hurst Diamond Shop for the year 1947 to 1950, inclusive. (Contested items indicated by the letter (c). Items without designation are either stipulated or uncontested. Note: No adjustments were necessary as to Schedule C, referred to above, which is respondent's computations of net worth of Hurst Diamond Shop for 1945 to 1947, inclusive.) I and J - Our revision of respondent's computation of adjusted gross income for the years 1945 to 1947, inclusive (Schedule I), and for the years 1948 to 1950, inclusive (Schedule J). (Contested items indicated by the letter (c). Items without designation are either stipulated or uncontested.) Where a contested item raises an issue of fact, we resolve the issue in our findings relating thereto with further explanation in our poinion to the extent that elaboration of the basis for our ultimate findings seems required. Where the *259 contested item involves the burden of proof, we likewise explain our views in our opinion. Schedule A
Net Worth - Ben Hurst
12-31-44
12-31-45
12-31-46
12-31-47
Commerce Trust Company -
(u) Ben Hurst, checking
$ 1,164.86
account
Sarah Hurst, checking
$ 666.13
$ 1,536.38
743.03
account
Merchants Bank -
(u) Ben Hurst, checking
585.00
321.64
account
Real Estate -
(u) 312 Main
$ 2,067.50
(u) 3335 Benton
13,500.00
13,500.00
13,500.00
1260 W. 71st Terrace
14,694.95
34,683.90
34,683.90
B & S Realty Company -
Notes payable to Ben
10,450.00
12,450.00
19,450.00
Hurst
Ben Hurst, capital
1,988.19
7,226.17
10,859.06
Sarah Hurst, capital
1,988.18
7,226.17
10,859.06
Hurst Diamond Shop, Ex. C
-
Account payable to Sarah
3,850.00
3,774.00
5,672.50
Hurst
Note payable to Sarah
20,147.96
20,000.00
20,000.00
21,000.00
Hurst
Ben Hurst, capital
82,456.53
73,027.38
79,647.30
90,944.53
Peoples Loan Company -
(u) Capital stock
500.00
(u) Note payable to Ben
700.00
Hurst
Hurst Mfg. Company -
Capital stock
5,100.00
10,000.00
Series E, U.S. Bonds
5,118.75
5,118.75
5,118.75
375.00
(u) Note receivable,
1,640.00
420.00
Henry A. Given
(u) Personal automobile
1,650.00
1,650.00
1,650.00
1,969.14
Furniture
5,937.69
5,937.69
(u) Fur coats
2,400.00
2,400.00
2,400.00
Net Worth, Ben and Sarah
$133,890.74
$157,708.58
$195,892.00
$207,258.77
Hurst
*260 Schedule B
Net Worth - Sarah and Ben Hurst
12-31-47
12-31-48
12-31-49
12-31-50
Commerce Trust Company -
(u) Ben Hurst, checking
$ 1,164.86
$ 1,373.14
$ 1,480.25
$ 368.22
account
(u) Sarah Hurst, checking
743.03
666.33
191.12
account
Plaza Bank of Commerce -
Sarah Hurst, checking
1,200.00
2,300.00
2,486.44
account
Real Estate - 1260 West 71st Terrace
34,683.90
34,683.90
34,683.90
34,683.90
B & S Realty Company -
Notes payable to Ben
19,450.00
19,450.00
Hurst
Ben Hurst, capital
10,859.06
15,597.91
Sarah Hurst, capital
10,859.06
15,597.91
B & S Realty Corporation
-
Receivable from Ben Hurst
(1,200.00)
(2,730.44)
Receivable from Sarah
( 500.00)
Hurst
Payable to Ben Hurst
18,550.00
18,050.00
Payable to Sarah Hurst
913.05
Capital stock, Ben Hurst
17,610.07
17,610.07
Capital stock, Sarah
17,610.07
17,610.07
Hurst
H & H Brokerage Company -
(u) Receivable from Ben
(104.00)
Hurst
Hurst Diamond Shop -
(u) Account payable to
5,672.50
5,072.50
5,072.50
5,072.50
Sarah Hurst
(u) Note payable to Sarah
21,000.00
23,100.00
22,125.00
23,525.00
Hurst
Ben Hurst, capital
90,944.53
101,157.15
93,245.96
124,340.41
Peoples Loan Company -
(u) Payable to Ben Hurst
700.00
1,700.00
1,750.00
3,497.11
(u) Capital stock
500.00
500.00
500.00
500.00
Waltham Watch Co. stock
865.60
865.60
(u) Series E, U.S. Bonds
375.00
375.00
375.00
375.00
(u) Personal automobile
1,969.14
1,969.14
1,969.14
1,969.14
Furniture
5,937.69
5,937.69
5,937.69
6,523.44
(u) Fur coats
2,400.00
2,400.00
2,400.00
2,400.00
Jeweiry
750.00
Uncashed checks
200.00
Net worth, Ben and Sarah
$207,258.77
$230,780.67
$224,966.30
258.905.51
Hurst *
*261 Schedule C
Hurst Diamond Shop
(formerly Hurst Jewelry and Loan Company)
12-31-44
12-31-45
12-31-46
12-31-47
(u) Cash on hand
$ 31,139.57
$ 2,019.61
$ 1,074.39
$ 1,220.73
(u) Cash in bank
6,322.24
10,193.02
2,857.76
634.13
(u) Customers' loans
47,865.65
50,419.35
22,299.25
253.65
(u) Customers' checks
147.85
277.23
3,319.41
20.00
returned
(u) Installment contracts
54,164.07
(u) Inventory
89,637.11
80,716.32
111,484.70
108,282.48
(u) Midland Jeweiry
2,602.17
Company
(u) Max Snyder
95.00
115.00
115.00
(u) Gus Solomon
200.00
(u) Phil Tobias
1,350.00
1,570.00
(u) Darwin Hurst
382.56
(u) B & S Realty Company
16,957.83
7,676.79
(u) Peoples Loan Company
39,491.78
(u) Missouri Unemployment
191.16
Commission
Government bonds
45,000.00
75,000.00
75,000.00
75,000.00
(u) Furniture & fixtures
18,148.41
19,252.59
33,315.02
35,756.68
(u) Automobile
1,300.00
1,300.00
(u) Prepaid expenses
1,098.00
3,497.60
796.74
1,143.19
(u) Accrued income
1,383.19
2,331.05
1,497.50
Total Assets
$242,152.16
$243,053.91
$272,201.15
$328,508.56
(u) Trade accounts
$ 253.90
$ 2,196.00
$ 19,329.09
$ 23,549.74
payable
(u) Cash payments -
1,550.73
lay-a-ways
(u) Other accounts
198.79
198.79
198.79
payable
(u) City National Bank &
875.00
65,000.00
Trust Co.
(u) Merchants Bank
28,000.00
38,000.00
49,877.38
(u) Leon Baum
500.00
500.00
300.00
(u) Abe Diamant
10,000.00
(u) George Gurnea
15,000.00
15,000.00
15,000.00
(u) Alvin Hurst
12,547.46
11,992.38
8,742.38
8,742.38
(u) Darwin Hurst
1,895.79
494.50
(u) Joe Hurst
(u) Morton Hurst
16.00
(u) Harry Jacobs
15,000.00
(u) Harry Krashin
4,000.00
3,600.00
3,600.00
Max Krashin
11,000.00
10,000.00
10,000.00
10,000.00
(u) Jennie and Joe Levine
10,000.00
6,000.00
16,000.00
15,000.00
(u) David Lipsky
5,000.00
5,000.00
(u) I. Moore
84.00
25.00
(u) Jack Ritz
2,000.00
(u) William and Freda
15,000.00
20,000.00
Ruback
(u) Ike Rubins
15,000.00
30,000.00
25,000.00
20,000.00
(u) Gus Solomon
1,800.00
1,000.00
(u) J. Steinberg
1,008.75
8.75
8.75
(u) Bette Tobias
1,600.00
(u) Mary E. Turner
1,000.00
1,000.00
1,000.00
1,000.00
(u) Pas Zimar
3,000.00
3,000.00
3,000.00
3,000.00
(u) Accrued expenses
4,380.53
5,114.60
5,211.62
7,907.44
(u) Reserve for
16,511.24
16,781.28
3,301.34
3,493.18
depreciation
Total Liabilities
$135,697.67
$150,026.53
$168,779.85
$210,891.53
(u) Sarah Hurst, account
$ 3,850.00
$ 3,774.00
$ 5,672.50
payable
(u) Sarah Hurst, note
20,147.96
$ 20,000.00
20,000.00
21,000.00
payable
(u) Ben Hurst, capital
82,456.53
73,027.38
79,647.30
90,944.53
Investment, Ben & Sarah
$106,454.49
$ 93,027.38
$103,421.30
$117,617.03
Hurst
Total Liabilities &
$242,152.16
$243,053.91
$272,201.15
$328,508.56
Capital
*262 Schedule D
Hurst Diamond Shop
12-31-47
12-31-48
12-31-49
12-31-50
(u) Cash on hand
$ 1,220.73
$ 650.00
$ 650.00
$ 650.00
(u) Cash in bank
634.13
2,398.73
4,560.81
789.80
(u) Trade accounts
54,164.07
94,136.99
107,266.24
187,916.68
receivable
(u) Other accounts
273.65
2,029.26
receivable
(u) Inventory
108,282.48
103,531.01
102,140.05
120,257.10
(u) Max Snyder
115.00
(u) Phil Tobias
1,570.00
1,570.00
26.00
(u) Darwin Hurst
382.56
2,238.12
90.00
(u) B & S Realty
7,676.79
6,926.79
Company
(u) B & S Realty
6,311.49
6,321.85
Corporation
(u) Peoples Loan
39,491.78
25,419.11
14,066.01
8,390.62
Company
Government bonds
75,000.00
65,000.00
65,000.00
30,000.00
(u) Furniture &
35,756.68
36,051.83
39,202.22
41,045.19
fixtures
(u) Automobile
1,300.00
2,250.00
1,800.00
(u) Prepaid expenses
1,143.19
208.16
3,139.75
2,942.59
(u) Accrued income
1,497.50
2,254.37
328.75
27.08
Total Assets
$328,508.56
$343,135.11 *
$342,665.32
$402,286.17
Trade accounts payable
$ 23,549.74
$ 27,327.41
$ 41,372.06
$113,077.22
(u) Other accounts
198.79
payable
(u) City National Bank
65,000.00
80,000.00
75,000.00
& Trust Company
(u) Commerce Trust
717.50
Company
(u) Merchants Bank
40,000.00
(u) H & H Brokerage
3,250.40
Company
(u) Abe Diamant
5,000.00
(u) George Gurnea
15,000.00
19,000.00
22,000.00
14,000.00
(u) Alvin Hurst
8,742.38
8,242.38
6,192.38
10,000.00
(u) Mortion Hurst
479.54
(u) Harry Jacobs
15,000.00
Max Krashin
10,000.00
13,000.00
13,000.00
(u) Jennie and Joe
15,000.00
18,000.00
5,000.00
5,000.00
Levine
(u) David Lipsky
2,000.00
2,000.00
2,000.00
(u) Jack Ritz
2,000.00
2,000.00
(u) William & Freda
20,000.00
23,000.00
25,000.00
24,500.00
Ruback
(u) Ike Rubins
20,000.00
5,000.00
5,000.00
(u) Gus Solomon
1,000.00
1,000.00
(u) J. Steinberg
3,000.00
3,000.00
(u) Mary E. Turner
1,000.00
1,000.00
(u) Pasor Zimar
3,000.00
(u) Accrued expenses
7,907.44
7,053.72
8,531.50
18,473.52
(u) Reserve for
3,493.18
7,181.95
11,125.92
14,850.08
depreciation
Total Liabilities
$210,891.53
$213,805.46
$222,221.86
$249,348.26
(u) Sarah Hurst,
$ 5,672.50
$ 5,072.50
$ 5,072.50
$ 5,072.50
account payable
(u) Sarah Hurst, note
21,000.00
23,100.00
22,125.00
23,525.00
payable
(u) Ben Hurst, capital
90,944.53
101,157.15 *
93,245.96
124,340.41
Investment, Ben & Sarah
$117,617.03
$129,329.65 *
$120,443.46
$152,937.91
Hurst
Total Liabilities &
$328,508.56
$343,135.11 *
$342,665.32
$402,286.17
Capital
*263 Schedule E
Adjusted Gross Income
1945
1946
1947
Net worth end of year (from Ex. B)
$157,708.58
$195,892.00
$207,258.77
Net worth beginning of year
133,890.74
157,708.58
195,892.00
Increase in net worth
$ 23,817.84
$ 38,183.42
$ 11,366.77
Add: Personal expenses and unallowable
deductions (from
Ex. D)
19,739.42
24,346.40
25,200.09
Total
$ 43,557.26
$ 62,529.82
$ 36,566.86
Less: Nontaxable income (from Ex. E)
155.90
5,266.54
2,000.00
Adjusted gross income - Ben & Sarah
$ 43,401.36
$ 57,263.28
$34,566.86
Hurst
Less: Income of Sarah Hurst (from Ex. F)
5,268.61
6,878.34
7,529.26
Adjusted gross income of Ben Hurst
$ 38,132.75
$ 50,384.94
$ 27,037.60
Schedule F
Adjusted Gross Income
1948
1949
1950
Net worth end of year (from Schedule
$230,780.67
$224,966.30
$258,905.51
B)
Net worth beginning of year
207,258.77
230,780.67
224,966.30
Increase in net worth
$ 23,521.90
$ (5,814.37)
$ 33,939.21
Add: Personal expenses and unallowable
17,764.06
15,122.86
11,927.58
deductions
Total
$ 41,285.96
$ 9,308.49
$ 45,866.79
Less: Nontaxable income
1,000.00
2,367.54
2,037.39
Adjusted gross income
$ 40,285.96
$ 6,940.95
$ 43,829.40
Schedule G
Ben and Sarah Hurst - Net Worth - Revised
Assets
12-31-44
12-31-45
12-31-46
12-31-47
(c) Cash on hand
$ 25,000.00
$ 10,000.00
$ 7,750.00
$ 5,500.00
Commerce Trust Co.
Ben Hurst checking account
1,164.86
Sarah Hurst checking account
439.13
666.13
1,536.38
743.03
Merchants Bank
Ben Hurst checking account
585.00
321.64
Plaza Bank of Commerce
Sarah Hurst checking account
Real Estate
312 Main
2,067.50
3335 Benton
13,500.00
13,500.00
13,500.00
(c) 1260 W. 71st Terrace
14,694.95
34,683.90
34,683.90
B & S Realty Co.
Notes payable to Ben Hurst
10,450.00
12,450.00
19,450.00
Ben Hurst capital
1,988.19
7,092.46
10,275.07
Sarah Hurst capital
1,988.19
7,092.46
10,275.07
B & S Realty Corp.
Receivable from Ben Hurst
Receivable from Sarah Hurst
Payable to Ben Hurst
Payable to Sarah Hurst
(c) Capital stock - Ben Hurst
(c) Capital stock - Sarah
Hurst
H & H Brokerage Co.
Receivable from Ben Hurst
Hurst Diamond Shop -
(Schedule C)
(c) Account payable to Sarah
3,850.00
3,774.00
5,672.50
Hurst
(c) Note payable to Sarah
20,147.96
20,000.00
20,000.00
21,000.00
Hurst
(c) Ben Hurst, capital
82,456.53
73,027.38
79,647.30
90,944.53
Peoples Loan Company
Note payable to Ben Hurst
700.00
Capital stock
500.00
Hurst Mfg. Company
(c) Capital stock
5,100.00
10,000.00
(c) Waltham Watch Co. stock
Series E, U.S. Bonds
5,381.75
5,381.75
5,381.75
375.00
Personal auto
1,650.00
1,650.00
1,650.00
1,969.14
(c) Furniture
5,937.69
5,937.69
Fur coats
2,400.00
2,400.00
2,400.00
(c) Jewelry
Uncashed checks
(c) U.S. Defense Stamps
4,450.56
Note receivable - Henry A.
1,640.00
420.00
Given
Net Worth
$164,043.43
$167,971.59
$203,637.58
$211,590.79
*264 Schedule G
Ben and Sarah Hurst - Net Worth - Revised
Assets
12-31-48
12-31-49
12-31-50
(c) Cash on hand
$ 3,250.00
$ 1,000.00
Commerce Trust Co.
Ben Hurst checking account
1,373.14
1,480.25
$ 368.22
Sarah Hurst checking account
666.33
191.12
Merchants Bank
Ben Hurst checking account
Plaza Bank of Commerce
Sarah Hurst checking account
1,200.00
2,300.00
2,486.44
Real Estate
312 Main
3335 Benton
(c) 1260 W. 71st Terrace
34,683.90
34,683.90
34,683.90
B & S Realty Co.
Notes payable to Ben Hurst
19,450.00
Ben Hurst capital
14,732.69
Sarah Hurst capital
14,732.69
B & S Realty Corp.
Receivable from Ben Hurst
(1,200.00)
(2,730.44)
Receivable from Sarah Hurst
(500.00)
Payable to Ben Hurst
18,550.00
18,050.00
Payable to Sarah Hurst
913.05
(c) Capital stock - Ben Hurst
17,610.07
17,610.07
(c) Capital stock - Sarah
17,610.07
17,610.07
Hurst
H & H Brokerage Co.
Receivable from Ben Hurst
(104.00)
Hurst Diamond Shop -
(Schedule C)
(c) Account payable to Sarah
5,072.50
5,072.50
5,072.50
Hurst
(c) Note payable to Sarah
23,100.00
23,125.00
23,525.00
Hurst
(c) Ben Hurst, capital
86,557.15
80,645.96
114,340.41
Peoples Loan Company
Note payable to Ben Hurst
1,700.00
1,750.00
3,497.11
Capital stock
500.00
500.00
500.00
Hurst Mfg. Company
(c) Capital stock
(c) Waltham Watch Co. stock
865.60
865.60
Series E, U.S. Bonds
375.00
375.00
375.00
Personal auto
1,969.14
1,969.14
1,969.14
(c) Furniture
5,937.69
5,937.69
6,523.44
Fur coats
2,400.00
2,400.00
2,400.00
(c) Jewelry
750.00
Uncashed checks
200.00
(c) U.S. Defense Stamps
Note receivable - Henry A.
Given
Net Worth
$217,700.23
$213,366.30
$248,905.51
*265 Schedule H
Hurst Diamond Shop - Revised
Assets
12-31-47
12-31-48
12-31-49
12-31-50
Cash on hand
$ 1,220.73
$ 650.00
$ 650.00
$ 650.00
Cash in bank
634.13
2,398.73
4,560.81
789.80
Trade accounts receivable
54,164.07
94,136.99
107,266.24
187,916.68
Other accounts receivable
273.65
2,029.26
Inventory
108,282.48
103,531.01
102,140.05
120,257.10
Max Snyder
115.00
Phil Tobias
1,570.00
1,570.00
26.00
Darwin Hurst
382.00
2,238.12
90.00
B & S Realty Co.
7,676.79
6,926.79
B & S Realty Corp.
6,311.49
6,321.85
Peoples Loan Co.
39,491.78
25,419.11
14,066.01
8,390.62
(c) Government bonds
75,000.00
65,000.00
65,000.00
30,000.00
Furniture & fixtures
35,756.68
36,051.83
39,202.22
41,045.19
Automobile
1,300.00
2,250.00
1,800.00
Prepaid expenses
1,143.19
208.16
3,139.75
2,942.59
Accrued income
1,497.50
2,254.37
328.75
27.08
Total Assets
$328,508.56
$342,635.11
$342,665.32
$402,286.17
(c) Trade accounts
$ 23,549.74
$ 27,327.41
$ 41,372.06
$113,077.22
payable
Other accounts payable
198.79
City National Bank &
65,000.00
80,000.00
75,000.00
Trust Co.
Commerce Trust Co.
717.50
Merchants Bank
40,000.00
H & H Brokerage Co.
3,250.40
Abe Diamant
5,000.00
George Gurnea
15,000.00
19,000.00
22,000.00
14,000.00
Alvin Hurst
8,742.38
8,242.38
6,192.38
10,000.00
Morton Hurst
479.54
Harry Jacobs
15,000.00
(c) Max Krashin
10,000.00
27,100.00
25,600.00
10,000.00
Jennie and Joe Levine
15,000.00
18,000.00
5,000.00
5,000.00
David Lipsky
2,000.00
2,000.00
2,000.00
Jack Ritz
2,000.00
2,000.00
William and Freda Ruback
20,000.00
23,000.00
25,000.00
24,500.00
Ike Rubins
20,000.00
5,000.00
5,000.00
Gus Solomon
1,000.00
1,000.00
J. Steinberg
3,000.00
3,000.00
Mary E. Turner
1,000.00
1,000.00
Pasor Zimar
3,000.00
Accrued expenses
7,907.44
7,053.72
8,531.50
18,473.52
Reserve for depreciation
3,493.18
7,181.95
11,125.92
14,850.08
Total Liabilities
$210,891.53
$227,905.46
$234,821.86
$259,348.26
Sarah Hurst, account
$ 5,672.50
$ 5,072.50
$ 5,072.50
$ 5,072.50
payable
Sarah Hurst, note payable
21,000.00
23,100.00
22,125.00
23,525.00
(c) Ben Hurst, capital
90,944.53
86,557.15
80,645.96
114,340.41
Investment, Ben and Sarah
$117,617.03
$114,729.65
$107,843.46
$142,937.91
Total Liabilities &
$328,508.56
$342,635.11
$342,665.32
$402,286.17
Capital
*266 Schedule I
Adjusted Gross Income - Revised
1945
1946
1947
Net worth end of year (from Schedule
$167,971.59
$203,637.58
$211,590.79
G-Revised)
Net worth beginning of year
164,043.43
167,971.59
203,637.58
(c) Increase in net worth
$ 3,928.16
$ 35,665.99
$ 7,953.21
Add: (c) Personal expenses and unallowable
18,989.42
23,596.40
24,450.09
deductions
Total
$ 22,917.58
$ 59,262.39
$ 32,403.30
Less: Nontaxable income
155.90
5,266.54
2,000.00
Adjusted gross income - Ben & Sarah
$ 22,761.68
$ 53,995.85
$30,403.30
Hurst
Less: Income of Sarah Hurst
5,268.61
6,744.57
7,079.05
Adjusted gross income of Ben Hurst
$ 17,493.07
$ 47,251.28
$ 23,324.25
Schedule J
Adjusted Gross Income - Revised
1948
1949
1950
Net worth end of year (from Schedule
$217,700.23
$213,366.30
$248,905.51
G-revised)
Net worth beginning of year
211,590.79
217,700.23
213,366.30
(c) Increase in net worth
$ 6,109.44
$ (4,333.93)
$ 35,539.21
Add: (c) Personal expenses and unallowable
17,014.06
14,372.86
11,177.58
deductions
Total
$ 23,123.50
$ 10,038.93
$ 46,716.79
Less: Nontaxable income
1,000.00
3,075.61
3,531.11
Adjusted gross income
$ 22,123.50
$ 6,963.32
$ 43,185.68 Findings - Statute of Limitations Ben and Sarah each filed timely Federal income tax returns for the calendar years 1945, 1946, and 1947 *267 with the collector of internal revenue for the district of Missouri. Ben filed his Federal income tax return for the calendar year 1947 on April 15, 1948, after duly applying for an extension and receiving permission therefor. More than three years but less than five years after April 15, 1948, the parties herein executed a consent agreement (Form 872) on January 13, 1953, extending the period of limitations on assessment for the calendar year 1947 to June 30, 1954. Thereafter, on May 26, 1954, Ben and the respondent, by a like consent, extended further the period of limitations on assessment for the taxable year 1947 to December 31, 1954. Petitioners and the respondent executed a consent agreement on January 13, 1953, extending the period of limitations on assessment for the calendar year 1948 to June 30, 1954. On May 26, 1954, petitioners and the respondent, by a like consent, again extended the period of limitations on assessment for the year 1948 to December 31, 1954. Likewise, petitioners and the respondent executed a consent agreement on January 13, 1953, extending the period of limitations on assessment for the taxable year 1949 to June 30, 1954. Thereafter, on May 26, 1954, *268 petitioners and the respondent extended further the period of limitations on assessment for the taxable year 1949 to December 31, 1954. Thereafter, on January 4, 1954, petitioners and the respondent executed a consent agreement extending the period of limitations for assessment for the taxable year 1950 to June 30, 1955. On December 17, 1954, respondent mailed a statutory notice of deficiency to Ben for the calendar years 1945, 1946, and 1947. Likewise, respondent mailed a notice of deficiency to petitioners for the calendar years 1948, 1949, 1950 on December 17, 1954. The parties hereto stipulated that if the individual returns of Ben for the years 1945 and 1946 only are not false or fraudulent returns made with the intent to evade tax, then respondent's determination of deficiencies for said years only is barred by the statute of limitations and the respondent is estopped from asserting deficiencies for said years. It is further stipulated that if the individual return of Ben for the year 1947 is not a false and fraudulent return made by him with the intent to evade tax, and the omission, if any, from amounts properly includible in gross income is in an amount less than 25 per cent *269 of the amount of gross income stated in the return for 1947, as defined under section 275(c) of the 1939 Code, as amended, respondent's determination of a deficiency for the taxable year 1947 is barred by the statute of limitations. Ben's income tax return for the taxable year 1947 and of petitioners for the year 1948 showed the following: HURST DIAMOND SHOP
(Ben Hurst, Proprietor)
1947
1948
Gross receipts (line 1, Diamond Shop)
$162,479.73
$193,068.95
Cost of goods sold (line 9)
82,982.34
105,072.44
Gross income from business
$ 87,232.98 *
$ 95,987.19 **
Other income (B & S Realty Corp.)
3,090.95
9,933.53
Net loss from sale of capital assets (Schedule
(1,000.00)
(1,000.00)
D)
Gross income per return
$ 89,323.93
$104,920.72
Other business deductions (page 3)
81,958.47
103,902.07
Adjusted gross income per return (page 3)
$ 7,365.46
$ 1,018.65
Other deductions
1,497.19
1,345.07
Net income per return
$ 5,868.27
$0 No other *270 income was reported by petitioners for either of the above years. Twenty-five per cent of the gross income per return for the taxable years 1947 and 1948 is $22,330.98 and $26,230.18, respectively. Opinion - Statute of Limitations Petitioners, relying on section 275, [1] *271 contend that assessment and collection of any deficiencies in income taxes for the years 1945 to 1948, inclusive, are barred by the statute of limitations. At the outset, as to the years 1945 and 1946, it is clear that the notice of deficiency for said years, mailed to petitioners on December 17, 1954, was not timely within the meaning of section 275(a), and in view of the stipulation of the parties relating to 1945 and 1946, supra, said years are clearly barred by limitations except upon proof that the returns filed for such years were false or fraudulent with intent to evade tax in accordance with section 276(a). Our opinion reflects our view, discussed hereinafter, that respondent has failed to establish that the return for either 1945 or 1946 was false or fraudulent with intent to evade tax. Accordingly, the statute of limitations bars assessment and collection of any deficiency for 1945 and 1946. With respect to the taxable years 1947 and 1948, the parties executed a series of waivers or consent agreements (Form 872), pursuant to section 276(b), [2] *273 extending the period of limitations on assessment of the tax for said years to December 31, 1954. The notice of deficiency for the years 1947 and 1948 was mailed to petitioners on December 17, 1954, more than 3 years after the returns were due, but by virtue of the aforesaid waivers, the 5-year statute of limitations is potentially *272 applicable to the deficiencies for 1947 and 1948. Accordingly, said years are barred unless fraud is proved or unless there was an omission from gross income in excess of 25 per cent of the gross income stated in the return. Section 275(a) and (c), section 276(a), Code of 1939. The meaning of "gross income" in section 275(c) does not differ from the definition of the term in section 22(a), and in the context of the instant case is construed as gross receipts reduced by the cost of goods sold plus other income. Iverson's Estate v. Commissioner, 255 Fed. (2d) 1 (C.A. 8, 1958), affirming 27 T.C. 786; Leslie H. Green, 7 T.C. 263, 277 (1946). The burden of proof to show that either section 275(c) or section 276(a) is applicable is upon the respondent. C. A. Reis, 1 T.C. 9 (1942), affd. 142 Fed. (2d) 900 (C.A. 6, 1944); section 1112, Code of 1939.
Where, as here, the amounts omitted from the taxpayer's net income have been determined by the net worth method, in order to equate the unreported adjusted gross income to gross income, it is incumbent upon the respondent to show that the unreported adjusted gross income is due to omission from gross income rather than from excessive deductions or overstatement of cost of goods sold. H. A. Hurley, 22 T.C. 1256, 1264-5 (1954), affirmed on another point 233 Fed. (2d) 177 (C.A. 6, 1956); David Courtney, 28 T.C. 658, 667-9 (1957). See Colony, Inc. v. Commissioner, 357 U.S. 28 (1958), in which the Supreme Court recently stated that section 275(c) is limited to situations in which a taxpayer "actually omitted some income receipt or accrual in his computation of gross income, and not more generally to errors in that computation arising from other causes." Applying the rationale of the Hurley, Courtney, and Colony, Inc. cases, supra, to the record in the instant case, it is clear that there is no evidence of omission of income received or accrued in the *274 years in question in excess of 25 per cent of the gross income reported on petitioners' returns, and that therefore respondent has failed to sustain his burden of proof under section 275(c). Again, in our discussion of the fraud issue infra, we hold that respondent has failed to establish fraud for either 1947 or 1948, and we must therefore conclude that the statute of limitations is a bar with respect to both years. Understatements of Income Introductory Although we approve the use of the net worth expenditures method to determine petitioners' income, we hold that petitioners have met the burden of proof of error in respondent's determination with respect to certain items. For convenience we have set out supra our Schedule G, which is a net worth schedule setting forth the understatements which we have determined for the years here involved. Some of the items therein were stipulated, and others, though not stipulated, were undisputed. Contested items are indicated by the letter (c). Items without designation are either stipulated or uncontested. Our findings of fact and opinion with respect to the disputed items will be set forth infra in the order in which they appear on our revised *275 reconstruction, Schedule G, supra. Findings - Accumulation of Cash Reserve Since 1909, and continuously until December 1946, Ben Hurst operated pawnshops at various locations in Kansas City, Missouri. Pawnshop stores owned and operated in the Kansas City area by Ben prior to January 1, 1945, were as follows Year
Location
1909
612 Main St. - Operated until 1912 when
stock of goods moved to 809 Main St.
1910
443 Minnesota - Acquired for $2,000 and
stock moved to 612 Main and 608
Walnut.
1910
608 Walnut - Operated until 1912 when
stock was sold for $12,000.
1912
809 Main St. - Operated until 1915 when
stock of goods moved to better location
at 817 Main.
1915
817 Main St. - Operated until 1925 when
inventory moved to better location at
821-23 Main St.
1917
1334 Main St. - Inventories sold in 1917 for
$3,000.
1917
2022 Main St. - Operated until 1920 when
part of inventories were liquidated for
$20,000 and balance put in stock of other
shops.
1918
12th & Highland - Operated until 1921
when inventories sold for $7,500.
1925
821-23 Main St. - Operated until 1944 when
inventories were sold for $52,000.
1927
1319 E. 18th St. - Operated until 1944 when
inventories were sold for $27,000.
1927
448 Minnesota - Operated until 1932 when
part of inventory was sold for $12,500
and balance of stock went into other
shops.
1942
1232 Main St. - Interest sold to son in 1944
for $20,000.
1941
1237 Main St. - Remodelled in December
of 1946 and business operation changed
to that of credit jewelry. Operated as
latter until destroyed by fire December
1956.
*276 Prior to January 1, 1945, Ben bought and sold real estate as follows: Year
Year
Acquired
Sold
Sale Price
Location
1919
1922
$19,250
3205 Highland
1919
1920
41,500
North Hotel
1919
1919
11,500
1518 E. 12th
1926
1936
5,500
209 E. 68th
Upon the death of his father, Victor Hurst, in 1932, Ben received the sum of $15,000 in cash from insurance proceeds. Commencing in 1914, Ben began a systematic savings plan of monthly deposits with the Farm and Home Savings & Loan Association, which required leaving the funds on deposit for 10 years at the maturity of which the savings so deposited were paid over to Ben, plus an agreed increase. Four of such savings contracts were commenced and completed as follows: Maturity
Date
Amount on Maturity or (*) Transfer
1924
$20,000.00
1925
10,000.00
1929
40,000.00
1932
(*) 2,500.00 (Not completed but
transferred to
Total
$72,500.00 Redetsky)
Prior to January 1, 1945, Ben owned a one-half interest in the Hurst Scrap Iron Company, a Missouri corporation which was liquidated in 1927 by the sale of its real estate. Upon the sale of said realty, Ben received the sum of $20,000 in cash and an additional $10,000 upon liquidation of its scrap iron inventories. Prior to and as of January 1, 1945, Ben *277 Hurst had $100,000 in life insurance in force and effect. During the late 1930's and early 1940's, Ben borrowed small amounts of money from insurance companies. On August 15, 1932, he borrowed from the Metropolitan Life Insurance Company the sum of $350 on his policy to pay his premium and repaid said amount on June 12, 1943. Ben also borrowed on the policy to pay his premiums in the years 1933 to 1937, inclusive, and in 1941. Ben borrowed money on his life insurance policies with Union Mutual Life Insurance Company, as follows: Policy
Date
Amount
Date
No.
of Loan
of Loan
Repaid
264001
6/17/40
$1,056.40
1/21/43
265918
6/17/40
1,023.44
1/21/43
275751
6/17/40
850.43
1/21/43
Likewise, during the late 1930's and early 1940's, Ben borrowed both large and small amounts of money from banks and private individuals. To obtain loans from the banks, Ben put up his Government bonds as collateral. During the years 1941 to 1944, inclusive, Ben or his businesses borrowed substantial amounts of money from the Merchants Bank of Kansas City, Missouri. In 1941, Ben borrowed the respective amounts of $1,000 and $1,475 from said bank, which he repaid by making daily payments in the sum of $25. During the years 1942 and 1943, *278 Ben borrowed money from lending institutions (not identified on the record) in the respective amounts of $27,050 and $86,086.17. During 1944, Ben and his businesses borrowed the total sum of $65,840.82 from the Merchants Bank. Also, during the years prior to and during the taxable years in question, Ben borrowed money from the City National Bank and Trust Company of Kansas City, Missouri. In applying for such loans he was obliged to submit statements of his financial condition to the bank. On the page of the financial statements where Ben's signature appears there is the following language: "I, the undersigned, hereby solemnly certify and declare that the above statement and representations constitute a true and accurate account of my financial condition as of the date first above given." On the statements submitted, Ben set forth in the space designated "cash" or "cash on hand and in the bank" the following amounts: Date
Amount
8/27/30
$10,500.00
12/31/30
20,500.00
12/31/32
19,500.00
1/30/33
11,725.03
12/31/33
5,445.66
12/31/34
6,030.12
12/31/35
4,066.14
12/31/36
5,426.05
12/31/37
7,285.44
12/31/46
35,000.00
/ /47
5,000.00
12/31/47
30,000.00
12/31/48
25,000.00
12/31/49
3,210.81 Ben or his businesses paid 6 per *279 cent interest for the use of the money borrowed from banks, and loaned such funds at rates of from 2 to 4 per cent per month. During the taxable years in question, Ben rented a safe deposit box in the Commerce Trust Company. Ben also had a large safe in his store in which he kept a substantial amount of cash on hand as a personal reserve in the immediate years before January 1, 1945. Said cash was kept in a separate "chest" within the safe. His store was protected against unlawful entry by an electric alarm system which connected the store with the American District Telegraph Company Central Station. In December of 1946, Ben discontinued the pawnshop business and went into a new venture, the credit jewelry business, under the name of Hurst Diamond Shop. During 1945, Ben used $15,000 of his personal cash reserve to purchase a cashier's check with which he paid off an indebtedness of Hurst Diamond Shop without receiving credit on the books of the company for said amount. During the years 1946 through 1950, petitioners expended the sum of $2,250 each year, or a total of $12,250 for that period, representing "personal cash expenditures," which was taken from Ben's personal cash reserve. *280 Ben's drawing account on the books of Hurst Diamond Shop for the taxable years in question shows the following entries: Hurst Diamond Shop
Ben Hurst
Drawing Account
Entries
Net Balance
Year
Debit
Credit
Debit
Credit
1945
$ 50,332.77
$ 19,486.71
$30,846.06
1946
125,256.88
131,011.67
$ 5,754.79
1947
42,706.53
65,694.24
22,987.71
1948
27,249.74
52,275.98
25,026.24
1949
31,321.85
42,980.00
11,658.15
1950
70,634.87
67,192.06
3,442.81
$347,502.64
$378,640.66
$34,288.87
$65,426.89
During the taxable year 1946, petitioners sold two businesses located at 821-23 Main (also known as 9th & Main) and at 18th Street (also known as 18th & Vine) for the respective amounts of $27,000 and $52,000 which were credited to Ben's drawing account in 1946. Ben's return for the year 1946 shows the sales under "other profit" in the amount of $6,595.35 (9th & Main) and $626.12 (18th & Vine). The return does not show the sale price or the cost basis of said realty. During the years 1918 through 1944, petitioners reported net income before exemptions and credits in the aggregate amount of $219,863.31, and paid Federal income taxes thereon in the total amount of $22,711.69. During some of these years, no tax was shown as due on the returns filed. No *281 tax returns were filed for the years 1913 to 1917, inclusive. Income tax deficiencies of $403.95 and $343.22 were determined against Ben in 1933 for the calendar years 1930 and 1931, respectively. Ben paid these deficiencies by a series of small monthly payments consisting generally of $20 or $25 a month spanning about a 3-year period. Petitioners received taxable income during the years 1934 to 1950, inclusive, from pawnshop, credit jewelry, and rental receipts, as follows: Net Income
Reported
Gross
Net Profit
Income
before
Receipts
Reported
Tax
Exemptions
from
from
Gross
Net
Returns
Year
& Credits
Pawnbroking
Pawnbroking
Rental
Rental
Joint
1934
$ 3,540.53
$ 60,919.98
$ 3,975.88
$2,100.00
$ 95.24
Joint
1935
2,910.32
66,351.55
2,497.26
2,220.00
1,039.97
Ben
1936
4,672.75
78,814.94
9,075.65
2,240.00
121.33
Joint
1937
(1,450.17)
70,860.62
(486.62)
1,775.00
(652.95)
Ben
1938
(2,342.15)
60,776.34
(2,177.84)
2,106.04
119.05
Ben
1939
3,148.15
75,121.62
3,750.96
1,940.00
(111.46)
Ben
1940
(1,743.06)
90,519.77
1,908.19
1,625.00
233.50
Ben
1941
4,335.31
112,013.09
9,195.47
1,500.00
(2,953.00)
Ben
1942
32,981.39
153,883.36
35,117.57
807.50
(1,160.93)
Ben
1943
25,870.74
126,012.46
26,861.63
2,126.66
(454.66)
Ben
1944
13,496.63
122,154.21
18,088.80 *
150.00
(305.32)
Sarah
1943
4,720.00
Sarah
1944
4,680.00
Sarah
1945
5,268.61
Sarah
1946
6,513.57
Sarah
1947
6,770.96
Ben
1945
7,438.00
186,610.83
10,098.40 *
(118.24)
Ben
1946
9,530.11
95,484.57
7,696.54
Ben
1947
7,365.46
162,479.73
5,274.51
Joint
1948
1,018.65
193,068.95
(7,914.88)
Joint
1949
(4,477.95)
177,330.34
(9,352.13)
Joint
1950
21,146.11
357,070.39
26,718.03 *
*282 Petitioners' reported net income (or loss) on their Federal income tax returns for the years involved is as follows: Net
Year
Income
Ben Hurst
1945
$ 6,938.00
Ben Hurst
1946
8,367.50
Ben Hurst
1947
5,868.27
Ben and Sarah Hurst
1948
(326.42)
Ben and Sarah Hurst
1949
(4,477.95) *
Ben and Sarah Hurst
1950
20,146.11
Total
$36,515.51
During the taxable years 1945 to 1947, inclusive, Sarah received an annual salary as a saleslady in Ben's establishment of approximately $4,600, part of which she drew and the remainder was credited to her account on the books of the company. Petitioners had five children who received their support from Ben in the years prior to 1940. During the years involved herein, Ben owned an automobile (Oldsmobile) which he traded in every year or two for a new one. His cigar bill during the year 1950 ran about $50 a month. Sarah owned a mink coat and ermine stole. On January 1, 1945, Ben had a personal cash reserve which he kept in his private safe in the amount of $25,000. Opinion - Cash on Hand It is *283 fundamental that in the use of the net worth method it is necessary to determine, with reasonable certainty, an opening net worth to serve as a starting point from which to calculate future increases in the taxpayer's assets. Holland v. United States, supra. The principal contention of the petitioners with regard to respondent's determination of opening net worth is that the year-end balances of cash on hand ("Personal Cash Operating Reserves") for the entire period have been arbitrarily determined to be zero by respondent when, in fact, Ben had $90,000 cash savings on hand as of January 1, 1945, and that substantial amounts thereof were absorbed into Hurst Diamond Shop, a new venture, in order to acquire brand name merchandise and provide working capital. It is petitioners' position that at the end of each year in question, after investing part of Ben's cash reserve in the credit jewelry business, he had personal cash on hand (apart from the amounts held by said business) in the following amounts: Year
Amount
1944
$90,000.00
1945
75,000.00
1946
66,995.21
1947
41,757.50
1948
14,481.26
1949
573.11
1950
1,765.92
In essence, it is petitioners' view that the increases in net worth, as shown by respondent's *284 computation, are not attributable to currently taxable income but primarily to $90,000 of undeposited cash savings which Ben had accumulated from business profits in prior years and which he had on hand on December 31, 1944. No contention is made that Sarah had any cash on hand at that critical date. Respondent, on the other hand, maintains that petitioners' failure to report "significant income" in years before the taxable period in question, Ben's voluminous borrowings, his statements to lending institutions, and his mode of life during the years prior to January 1, 1945, justify a determination of no personal cash reserve at the start of the net worth period. It should be noted that respondent has given the Hurst Diamond Shop credit for $31,139.57 cash on hand (representing cash on hand - $6,139.57; an undeposited burglary check - $11,500.00; and a cashier's check - $13,500.00) and $6,322.44 for cash in bank at December 31, 1944. If the increase in petitioners' net worth was not actually attributable to unreported income, as petitioners urge, it is incumbent upon them to establish that fact by "competent and satisfactory evidence." Carmack v. Commissioner, supra. For reasons hereinafter *285 discussed, we do not believe petitioners have met this burden. In attempting to overcome respondent's determination, petitioners, on brief, set forth a detailed tabulation showing the proceeds of cash and notes from various sales, exchanges, and transfers made by Ben from 1911 to 1936, inclusive, in the total amount of $313,000, which was allegedly kept in cash form in the store safe and which he allegedly used from time to time to acquire assets and make business loans and investments, so that on December 31, 1944, the sum in controversy herein, $90,000, remained in his personal cash reserve. While we do not doubt that Ben actually engaged in the sundry transactions enumerated in said schedule, petitioners have failed to establish to our satisfaction that the alleged profits were kept in cash and intact in the intervening years before January 1, 1945. Few reliable records of Ben's investments and cash retentions over the years were introduced into evidence by petitioners, and from the state of the record we have no way to ascertain how much net profit Ben realized and had retained in cash at the end of 1936 from his business activities. It is noteworthy that the Commissioner determined *286 income tax deficiencies against Ben in 1933 for the calendar years 1930 and 1931 in the respective amounts of $403.95 and $343.22, and that Ben paid these deficiencies by a series of small monthly payments consisting generally of $20 or $25 a month spanning almost a 3-year period. Although petitioner may have had a valid (though undisclosed) reason for his method of payment, it tends to negate his position that he had a substantial amount of cash on hand during those years. Similarly, we note that as late as 1941, Ben borrowed amounts of $1,000 and $1,475 from the Merchants Bank of Kansas City, Missouri, which he repaid by making payments at the rate of $25 per day. Ben explained that his extensive borrowings of small amounts of money from said bank, insurance companies, and private individuals during the years prior to 1945 were attributable to the fact that he was able to lend the funds out as business loans at a substantial profit. Although Ben no doubt needed substantial amounts of cash in his pawnbroking and money lending business, it is at least strange that, as an apparently successful businessman, he would have repaid amounts borrowed from the Merchants Bank by daily payments *287 of $25 while retaining $90,000 of accumulated and unproductive cash in his store safe. Our view is the same with respect to his argument that he borrowed cash on his policies with the Metropolitan Life Insurance Company to help his brother out. Likewise, we reject petitioners' contention, on brief, that their earnings for the years 1940 through 1944 constituted a source for the accumulation of a $90,000 cash fund. For the 5 years immediately prior to December 31, 1944, Ben alleges that his reported net income (after capital gain adjustments and before exemptions and credits) amounted to $102,605.35, and that after deducting "estimated cash expenses" at the annual rate of $2,250, or an aggregate of $11,250 for said years, there remained the sum of $91,355.35 as a "source" of the $90,000 cash fund in controversy. Obviously, said argument is inconsistent with his primary argument, discussed above, that the alleged cash hoard of $90,000 was amassed from profits realized between 1911 and 1936. Furthermore, it is apparent that petitioners, in deducting the sum of $2,250, are only considering the amount of unidentified personal (cash) expense disbursements which the parties stipulated as *288 having been paid in cash during each of the subsequent years actually involved herein. While the record does not disclose the extent of petitioners' personal expenses during the 5 years prior to December 31, 1944, it is reasonable to infer that their personal expenses were much greater than $2,250 a year. There is no evidence of how much of such personal expenses was paid in cash for the years 1940 to 1944, inclusive. The record shows that during the years 1945 to 1950, inclusive, petitioners' personal expenses were in excess of $15,000 for all of the years except one, and that during 1947 their personal expenses were in the amount of $21,200.09. Assuming that petitioners could have met their personal needs by the use of funds reflected through capital gain adjustments and exemption credits during the 5 years prior to December 31, 1944, there is no explanation in the record why Ben, during the years 1942, 1943, and 1944, withdrew from his business the respective amounts of $4,622.24, $27,498.85, and $30,073.07. Ben has advanced a number of reasons for his accumulation of the alleged cash reserve of $90,000 on hand as of December 31, 1944, but in view of other cogent facts of record, *289 we find his testimony unacceptable and insufficient to support the existence of a cash reserve in the amount claimed, although we do not doubt that he did keep substantial funds in the store safe prior to and during some of the critical years involved herein. The significant question is how much of said personal cash funds was on hand on December 31, 1944? It would extend this opinion interminably, but at the same time serve no useful purpose, to analyze all of the arguments pro and con advanced on behalf of Ben, on the one hand, and respondent on the other. We have examined into each of them with meticulous care. Most of the arguments presented on Ben's behalf are either unsound, inconclusive, or unworthy of belief. It is impossible, on the record presented, for us to reach a precise conclusion. We have determined the amount of Ben's personal cash reserve on December 31, 1944, to be $25,000, and, in our judgment, there is no credible evidence of an identifiable amount in excess of that figure. While we have reached this conclusion only after a careful analysis of the entire record, the result we have reached is substantially based upon the discussion which follows. The burden, of *290 course, rests with Ben to prove the amount of cash on hand as of the end of 1944, and each succeeding year where material. We are satisfied that he did have a substantial personal cash reserve as of December 31, 1944. As indicated above, the crucial question is, how much? Ben testified very positively at the trial that the personal cash reserve on hand as of December 31, 1944, was $90,000. This testimony, however, must be contrasted with his earlier testimony presented under oath on July 10, 1953, to officers of the Intelligence Unit of the Internal Revenue Service, at which time Ben stated that his personal cash reserve was more than $25,000, but he could not state that he ever had as much as $50,000. No intermediate figure was suggested. We think his sworn statement to the agents is so significant that we set forth excerpts therefrom in the margin. [3] *291 *292 Ben's very positive testimony at the trial, and his vague testimony before the agents, must be weighed in the light of the surrounding circumstances. This testimony at the trial was given after the significant issues in the case had been largely crystallized, and after respondent's statutory notice had been received. It was then quite *293 apparent that an opening personal cash reserve of $90,000 would dovetail very effectively with Ben's approach in his effort to demonstrate complete error in respondent's determination. At the time of the hearing before the agents, however, the statutory notice had not been received, and the issues had not been projected to the point where the amount of cash on hand necessary to explain claimed understatements was so apparent. Ben's recollection in 1953 should have been as clear as or clearer than it was at the trial in 1957. We think his positive statement, made at the trial in 1957, was a mere rationalization or reconstruction of his position, based on his then projected position rather than on reliable recollection. Despite the foregoing, we think Ben did have substantial cash on hand, and that it is reasonable to believe that the amount was $25,000 or thereabouts, as indicated in his 1953 testimony. We therefore allow him this amount as a personal cash reserve on hand as of December 31, 1944. What we have said with respect to Ben's testimony as to his personal cash reserve applies largely to the testimony of Waldman and Alvin Hurst. The former testified that he counted the cash *294 in January of 1946, and the latter claimed to have done likewise in December of 1945. Each came to a figure of $75,000, which again fitted into the scheme of Ben's contention since Ben, who claimed the cash was $90,000 as of December 31, 1944, had used $15,000 of his cash reserve to purchase a cashier's check in 1945. The rationalization is again apparent. Ben, in his 1953 statement, testified that nobody knew the amount of the cash in his safe; that "not even my wife knew that." The alleged counting by Waldman and Alvin was not mentioned in 1953. Moreover, our observation of both witnesses satisfied us that they were strongly biased in favor of Ben. Consistent with the foregoing, we make allowances for personal cash reserve in succeeding years as set forth below. We allow $10,000 as of December 31, 1945, since Ben used $15,000 in 1945 (to be discussed infra) to purchase a cashier's check to pay off a business debt for which he received no credit in his drawing account. As of the end of each succeeding year, we have deducted from the $10,000 included as of the end of 1945, the respective sums of $2,250, stipulated as "personal cash expenditures," resulting in a balance of $1,000 personal *295 cash reserve as of December 31, 1949, and a complete exhaustion thereof in the following year. See our Schedule G, supra. We recognize that Ben's calculation shows a personal cash reserve of only $573.11 as of December 31, 1949. This calculation is based upon an approach differing from that which we have followed. We think our own approach is correct on the basis of the record. Moreover, the difference in practical result is insignificant since there is a mere allocation between 1949 and 1950, one party getting the benefit in the earlier year and the other party in the latter. We are also mindful of the financial statements submitted by Ben to the City National Bank showing "cash on hand and in the bank" in the amount of $35,000 at the end of 1946. Ben himself takes the position that this amount (evidently a round figure) was a part of the assets of Hurst Diamond Shop rather than personal cash reserve. We do not think the statement to the bank has any probative value with respect to Ben's personal cash reserve as of December 31, 1944 (at which date respondent allowed $31,139.57 cash on hand and $6,322.24 with respect to Hurst Diamond Shop), or any later date. It is clear that Ben *296 regarded his "personal cash reserve" as in fact personal, i.e., unrelated to any of his several businesses, and that he did not take it into consideration on the occasions on which he furnished statements to banks. The cash on hand and in bank of Hurst Diamond Shop is not a contested issue. We likewise recognize that we have allowed Ben no credit as a disposition of funds alleged to have been formerly part of his net cash reserve in relation to his alleged "net cash investment" in Hurst Diamond Shop during the years 1946 to 1950, inclusive. In this connection, we find Ben's testimony at the trial, and the explanation of the entries in his drawing account, unpersuasive and inconsistent with his sworn statement made in 1953. We find no merit in petitioners' arguments to the effect that under Holland v. United States, supra, respondent failed to follow up leads or show a likely source of the income which respondent claimed to have been understated. Much emphasis is placed on the fact that Agent Cravens failed to inquire about cash on hand as of January 1, 1944. It is clear, however, that Ben was represented by competent counsel and an able accountant, both of whom knew the problem, and *297 neither of whom furnished any leads to be followed in the investigation. Moreover, prior to the issuance of the statutory notice, other agents (of the Intelligence Unit) made searching inquiry of Ben as to cash on hand. Ben was personally at the hearing in 1953 at which the inquiries were made, and was represented by his accountant. Neither furnished any helpful leads. The obvious fact is that if there were any such leads, Ben had as great (or greater) opportunity to follow them up as did the agents. In addition, it is clear that Ben was not prejudiced, because at the trial he produced all of the evidence as to personal cash reserve to which reference has at any time been made. In Holland v. United States, supra, the Supreme Court said, in part (p. 137): "But where relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant." See also Kampmeyer v. United States, 227 Fed. (2d) 313, 316, 317 (C.A. 8, 1955). The record shows that during the taxable years in question, Ben was the sole owner of Hurst Diamond Shop which had gross receipts ranging between $95,484.57 in *298 1956 and $357,070.39 in 1950. He also dealt in loose diamonds from time to time, operated the Peoples Loan Company, B & S Realty Company, and the B & S Realty Corporation, from which he received taxable income, and loaned money at high rates of interest. In our judgment, the likely sources of income are well established. Findings - Personal Residence, 1260 W. 71st Terrace During the year 1945, petitioners acquired a personal residence from the B & S Realty Company, which had theretofore held the property as a business asset. After acquiring title, petitioners entered into a contract with Glenn Akridge, a general contractor, to remodel, redecorate, and landscape the property, and the work was completed about May 1956. Akridge remodeled the entire residence, interior and exterior, concreted the driveway, regraded and landscaped the yard, and hung new awnings, at a contract price of $20,069.28. Later that year, Akridge performed extra work on the premises for which he received the additional sum of $648.95 in June 1946. As the work progressed, Ben would give Akridge a "drawing," sometimes in cash and sometimes by checks signed by Ben and drawn on the account of Hurst Diamond and Loan *299 Company. Opinion - Personal Residence, 1260 W. 71st Terrace Respondent determined, as reflected in his net worth schedule, that the "investment" of Ben in the personal residence located at 1260 W. 71st Terrace was in the amount of $14,694.95 at the end of 1945, and in the amount of $34,683.90 at the end of each of the years 1946 to 1950, inclusive, or an increase in net worth at the end of 1946 in the amount of $19,988.95. See Schedules A and B, supra. Petitioners contend that Ben's cost of said realty was $13,344.95 at the end of calendar year 1945 and only $25,299.09 [4] at the end of 1946-1950, inclusive. It is petitioners' position that the sums of $13,344.95 and $11,954.14 were expended in 1945 and 1946, respectively, and that the "entire cost" of the residence after remodeling and redecorating work was $25,299.09 rather than $34,683.90, as respondent urges. No extended discussion on this issue is required. We sustain respondent because petitioner has failed to meet the burden of proof of error in *300 respondent's determination on this issue. In any event, no increase in net worth or understated income results except in years in which we have held that limitations apply. Findings - B & S Realty Corporation The parties stipulated that the correct amounts representing petitioners' capital investment in B & S Realty Company, a partnership, for the taxable years ending December 31, 1945 to 1948, inclusive, are as follows: B & S Realty Co.
12-31-45
12-31-46
12-31-47
12-31-58
Note payable to Ben Hurst
$10,450.00
$12,450.00
$19,450.00
$19,450.00
Ben Hurst, capital
1,988.19
7,092.46
10,275.07
14,732.69
Sarah Hurst, capital
1,988.19
7,092.46
10,275.07
14,732.69 Said amounts are reflected in our revised net worth statement for the years involved herein. Schedule G, supra. During the year 1945, petitioners purchased a residence located at 1260 West 71st Terrace as their personal dwelling from the B & S Realty Company and said property was eliminated from the assets of said company. On July 1, 1949, the remaining assets of the B & S Realty Company were transferred to the B & S Realty Corporation, a Missouri corporation. Petitioners owned all of the capital stock of the new corporation. The corporate books *301 showed the basis of such capital stock to be in the aggregate amount of $19,734 as of July 1, 1949. Respondent determined, as reflected in his net worth statement for petitioners, that petitioners' accounts in the B & S Realty Corporation at the end of 1949 and 1950 were as follows: 12-31-49
12-31-50
Receivable from Ben
Hurst
[1,200.00)
[2,730.44)
Receivable from Sarah
Hurst
(500.00)
Payable to Ben Hurst
18,550.00
18,050.00
Payable to Sarash Hurst
913.05
Capital stock of Ben
Hurst
17,610.07
17,610.07
Capital stock of Sarah
Hurst
17,610.07
17,610.07
Opinion - B & S Realty Corporation The testimony and the contentions of the parties on this issue are vague, confusing, and inconclusive. Nevertheless, we must resolve the problem as best we may from the record as presented. The stipulation of the parties in Docket No. 56866 shows the capital of the partnership (B & S Realty Company) to be $29,465.38 as of December 31, 1948. The books of B & S Realty Corporation purport to show capital in the amount of $19,734 as of July 1, 1949 (the inception of the corporation). There is nothing to show the nature or validity of the adjustments for the 6-month period from December 31, 1948 to July 1, 1949. Petitioners' accountant *302 makes some vague suggestions that the property, 1260 W. 71st Terrace, was eliminated from the assets of the partnership at the time that the partnership was taken over by the corporation. The testimony of the accountant, however, is not at all clear on this point. In addition, the property was taken over by Ben and his wife, and actually ceased to be an asset of the partnership in 1945. The agent testified that she regarded the property as an item separate from that the partnership and treated it as a separate item in her schedules. In addition, the figures relating to the cost of the property and renovations thereof (discussed under the issue immediately prior to that now under consideration) do not explain the difference between the partnership capital as of December 31, 1948, and the corporation's capital as of July 1, 1949, whether we adopt the amounts claimed by petitioners or those claimed by respondent. No other explanation being furnished, such as partnership losses during the period from December 31, 1948 to June 30, 1949, we have no basis for accepting as correct a capital figure of only $19,734 for the corporation as of July 1, 1949, since the burden of proof rests with *303 petitioners. Petitioners argue that in determining capital of the corporation to be $35,220.14 as of December 31, 1949, the agent made various adjustments of the partnership accounts for prior years which were inconsistent with the stipulation of the parties fixing the capital of the partnership in the amount of $29,465.38 as of December 31, 1948, in effect duplicating such adjustments, at least in part, in arriving at the capital of the corporation as of December 31, 1949. We find nothing in the record to support the view that such duplication occurred. There is no basis for an assumption that the capital of the partnership as of December 31, 1948, per stipulation, is the same as the capital per the books of the partnership. The agent admittedly made numerous adjustments in the partnership accounts for periods prior to the inception of the corporation, but these adjustments were made in her net worth schedules prepared sometime in 1954. The stipulation, however, was filed at the trial in 1957. It appears reasonable to infer that her adjustments to the partnership accounts (in turn reflected in the capital account of the corporation as of December 31, 1949) were likewise taken into *304 account and reflected in the later stipulation of the parties, establishing the capital of the partnersrip as of December 31, 1948. In all events, there is no evidence to the contrary. By the same token, there is no evidence of error in respondent's determination of the capital of the corporation as of December 31, 1949, which determination is the same in amount as the figure reached by the agent. If the determination, considered in the light of the stipulation, resulted in duplication of income or the shifting of income from earlier years to 1949, it was incumbent upon the petitioner to demonstrate such duplications or shifting of income and the amounts duplicated or shifted. Petitioner has failed to do so. Apparently, the purpose of the stipulation was to avoid such duplication or shifting, and we find no basis for holding that it failed of its purpose. We must therefore sustain respondent on this issue. Findings - Account Payable to Sarah Hurst; Note Payable to Sarah Hurst (Hurst Diamond Shop) In reconstructing the increase in Ben's net worth for the years 1945-1947, inclusive, respondent found that Sarah's assets were relevant, and therefore included the combined assets of petitioners *305 in his net worth schedule, which included, inter alia, an account payable and note payable account to Sarah, as reflected on the books of Hurst Diamond Shop. See Schedule C, supra. At the end of his computations, to arrive at the understated income of Ben for those years, respondent then subtracted Sarah's adjusted gross income from the combined adjusted gross income of petitioners. Opinion - Account Payable to Sarah Hurst; Note Payable to Sarah Hurst (Hurst Diamond Shop) Petitioners, in their stipulations, do not contest the correctness of the amounts owed to Sarah by Hurst Diamond Shop during the period involved herein. They originally objected to the propriety of including Sarah's assets in computing Ben's increase in net worth as she is not a party to the proceedings in Docket No. 56867. At the close of the trial, however, counsel for petitioners stated that for the purpose of any calculation to be made in either of the consolidated dockets herein, he would "agree to the combination of their assets to arrive at any net worth figure if the net worth method is utilized." We have held, supra, that the use of the net worth method was appropriate. We add that we have held that the *306 years affected are barred by limitations. There is no occasion, therefore, to disturb the respondent's computation as to the items in question. Findings - Ringolsky & Jacobs Prior to or during 1947, Ben posted a bail bond in the nature of certain real estate belonging to Hurst Diamond Shop as an appearance bond in the amount of $10,000 for Grace Wynne, who had been arrested for a felony, in the case of State v. Wynne, 356 Mo. 1095, 204 S.W. 2d 927 (1947). Wynne was not an employee of Ben or of Hurst Diamond Shop. During the year 1947, Ben was obliged to retain the legal services of Ringolsky & Jacobs, attorneys, to represent him in a legal action brought against him individually for forfeiture to the State of Missouri of the realty which he had put up for the aforesaid appearance bond. Subsequently, Ben paid Ringolsky & Jacobs the sum of $3,500 as a legal fee for the successful defense of the suit, and said amount was placed on the books of Hurst Diamond Shop as a deductible business expense. The book entry shows that on December 15, 1947, a charge in the amount of $3,500 was made, as a business expense incurred by Hurst Diamond Shop described as "Services in matter of appeal of *307 judgment on bond, State of Missouri v. Hurst. Services in preparation for filing of application for remitter to Governor of State of Mo. in matter of Wynne Bond. Services in trial of State of Mo. v. Hurst before Hon. Brown Harris resulting in remitter of all of bond except $520." Opinion - Ringolsky & Jacobs Respondent determined that Ben's capital account in the Hurst Diamond Shop as of the end of 1947 was in the amount of $90,944.53. See Schedule D, supra. Petitioners maintain that Ben's capital account for that period is only $87,444.53, and that the difference of $3,500 should be shown on respondent's net worth statement as a business debt due Ringolsky & Jacobs as of December 31, 1947. It is petitioners' position, relying on Kornhauser v. United States, 276 U.S. 145 (1928), that said legal fee was expended in successfully retaining and conserving a business asset from forfeiture in a transaction entered into for a profit under section 23(a)(1)(A) or section 23(a)(2). Respondent argues that petitioners have failed to show whether or not said expenditure was an ordinary and necessary expense of the Hurst Diamond Shop and that Ben expended said amount in a personal transaction *308 not connected with the Diamond Shop. We find no evidence in the record before us that Hurst Diamond Shop was in the business of posting bail bonds for patrons. Moreover, the action brought against Ben for forfeiture of the appearance bond and the recordation of the expenditure on the books of Hurst Diamond Shop indicate that the posting of the bond was his individual undertaking unrelated to the business activities of the company. In view of the foregoing, we find that petitioners have failed to establish that said amount represented an ordinary and necessary business expenditure of the Hurst Diamond Shop within the meaning of section 23(a)(1)(A) or section 23(a)(2). Greenspon v. Commissioner, 229 Fed. (2d) 947 (C.A. 8, 1956), affirming on this point 23 T.C. 138 (1954). Accordingly, we hold that Hust Diamond Shop is not entitled to deduct the amount of $3,500 as a legal fee incurred in its trade or business at the end of the calendar year 1947. We again note that we have held that the year in question is barred by limitations. Findings - Hurst Manufacturing Company - Capital Stock Respondent, in his computation of Ben's increase in net worth for the years 1945-1947, inclusive, *309 included as an asset certain Hurst Manufacturing Company capital stock as of December 31, 1944 and 1945, in the respective amounts of $5,100 and $10,000. See Schedule A, supra. No stock ownership is shown in his computation for said company as of the end of any of the other taxable years involved. The item of $5,100 was owned by Sarah as of December 31, 1944 and 1945. In addition to Sarah's holdings, Ben acquired $4,900 of said stock in 1945 which he still owned on December 31 of that year, at which time the basis of the combined ownership of said stock was $10,000. Opinion - Hurst Manufacturing Company - Capital Stock Petitioners' counsel, at the close of the trial, withdrew any objection to the treatment of Sarah's assets as belonging to Ben, so that there is no occasion for further discussion of such treatment. Petitioner claims that Sarah's holdings were $4,900 instead of $5,100, but we think the record supports the fact that the correct amount was $5,100. In any event, the issue has become moot since we have held that the two years involved are barred by limitations. Opinion - Personal Furniture Respondent determined, as reflected in his net worth statement, that Ben's investment *310 in furniture for his residence was in the amount of $5,937.69 at the end of the years 1946 to 1949, inclusive, and $6,523.44 at the end of 1950. See Schedules A and B, supra. Petitioners contend that the amount of furniture indicated on respondent's net worth statement should be in the amount of $4,873.16 as of the end of calendar years 1946 to 1949, inclusive, and the sum of $5,458.91 as of the end of 1950. Upon analysis, it becomes apparent that the differing contentions produce no difference in end result. The years 1946, 1947, and 1948 are barred by limitations. Respondent does not claim an increase in net worth based on this item for 1949. With respect to 1950, respondent starts with an opening figure of $5,937.69 and a year-end figure of $6,523.44, showing an increase of $585.75. Petitioner starts with an opening figure for 1950 in the amount of $4,873.16 and a closing figure of $5,458.91, likewise showing an increase for the year of $585.75. Since the only year affected is 1950, it is immaterial as to which figures we adopt. For convenience, we have included in our net worth statement the figures determined by respondent. Findings - War Savings Stamps Ben purchased War Savings *311 Stamps during the year 1942 in the amount of $1,430.63; in the amount of $2,931.93 during 1943; and in the amount of $388 during 1944, or a total amount of $4,750.56. During 1943, Ben sold $300 worth of said stamps, leaving a total of $4,450.56 on hand as of the end of calendar year 1944, as reflected on a schedule prepared by petitioners about November 5, 1948, at the request of the internal revenue service. The aforesaid defense stamps were cashed in at the end of World War II (in 1945) by petitioners and the proceeds thereof put into the Hurst Diamond Shop. Opinion - War Savings Stamps Our findings on this issue are in accordance with petitioners' contentions. Since we have held that the years affected are barred by limitations, there is no occasion for us to discuss respondent's contentions on the merits. Opinion - Waltham Watch Company Stock Respondent, as reflected on his net worth statement herein, determined that petitioners' net worth was increased in the amount of $865.60 for the first time as of December 31, 1949, by the purchase of Waltham Watch Company stock and that petitioners had said stock in that amount on hand as of the end of the net worth period in question. *312 See Schedule B, supra. Petitioners urge that they owned said stock prior to January 1, 1945. The record does not disclose any testimony by petitioners which specifically alludes to the fact or time of the purchase or acquisition of the Waltham Watch Company stock in controversy. There is some reference in Ben's testimony to an expenditure of the sum of $550 in the year 1944 for the purchase of "stock," but there is no mention of any particular stock. The burden of proof on this item was, of course, on the petitioners, and in our opinion they have failed to establish that the stock in question was on hand prior to January 1, 1949. Accordingly, respondent is sustained on this item. Findings - Jewelry Respondent, as reflected in his net worth statement, determined that petitioners acquired an item of jewelry in the amount of $750 for the first time during the calendar year 1950. See Schedule B, supra. On undisclosed dates, Ben made platinum earrings for his wife, Sarah, and reset a diamond ring with a new platinum setting, the diamonds for which he had obtained from his pawnshop. Opinion - Jewelry Petitioners contend that the disputed jewelry item in the amount of $750 was on hand *313 at December 31, 1944, and the end of all subsequent years involved herein. Respondent disputes the claim that Sarah had acquired said jewelry in the earlier years although he does not question the amount thereof. Again, the burden of proof was on petitioners to establish that said assets were on hand at the opening of the net worth period and at the end of all subsequent years in question. Ben testified that he had given Sarah diamond earrings and a ring which he had obtained from his pawnshop. He failed, however, to offer any evidence as to the date or dates on which he acquired the particular jewelry given to his wife, and in the absence of such proof, we have no basis for holding that the jewelry in dispute was on hand at the beginning of the net worth period. In view of Ben's vague testimony on this issue, we hold that petitioners have failed to meet the burden of proving that the jewelry in question was purchased prior to the year 1950. Accordingly, respondent is sustained on this item. Opinion - United States Government Bonds During the years 1944 through 1947, Ben purchased and sold numerous Government bonds. Respondent determined that the Hurst Diamond Shop had United States *314 Government bonds in the amount of $45,000 on hand at December 31, 1944, and the sum of $75,000 on hand as of the end of 1945, 1946, and 1947. See Schedules A and B, supra. We have held, supra, that the bar of the statute of limitations applies to the years in which net worth increases may be attributed to acquisition of United States Government bonds. Extended discussion on the merits is thereby rendered unnecessary. We add for completeness that, had limitations not applied, we would have sustained respondent's determination on this issue for failure on the part of petitioners to sustain the burden of proving error. Findings - "Trade Accounts Payable" The books and records of Hurst Diamond Shop, a sole proprietorship owned by Ben, show a liability account designated as "Trade Accounts Payable," as of the end of calendar year 1950 in the total amount of $114,517.22. Respondent, in determining the net worth increase of the Hurst Diamond Shop as of the end of 1950, as reflected in his net worth schedule, shows said Trade Accounts Payable account to be in the amount of $113,077.22, omitting the amount of $1,440 allegedly due Herbert Rosenthal, a jeweler who did a substantial amount *315 of work for Hurst Diamond Shop. The amount of $1,440 disallowed by respondent was paid to Rosenthal in 1951. See Schedule D, supra. Opinion - "Trade Accounts Payable" Respondent disallowed the alleged liability of the Hurst Diamond Shop as of the end of calendar year 1950 in the amount of $1,440 for lack of substantiation, claiming that the expenditure was for work performed on personal jewelry owned by Ben. Petitioners, on brief, contend that said item was incurred in the trade or business of Hurst Diamond Shop and was not personal in character. Respondent's determination with respect to this item is prima facie correct and petitioners have the burden to show error therein. Petitioners' accountant admitted that he did not know whether or not the amount in question was a liability incurred in the trade or business of the Hurst Diamond Shop. Ben did not testify with respect to this item. In the absence of any affirmative evidence to establish the true nature of the indebtedness in question, we hold respondent's determination to be correct. Findings - Cashier's Check ($15,000) During the period prior to the net worth years involved herein, Ben purchased cashier's checks in varying *316 amounts. On August 4, 1945, Ben purchased a cashier's check in the amount of $15,000 from the Commerce Trust Company of Kansas City, Missouri, payable to Merchants Bank, Kansas City, Missouri. Hurst Diamond Shop (formerly Hurst Jewelry and Loan Company) was indebted to the Merchants Bank at the end of calendar years 1944 and 1945 in the amounts of $28,000 and $38,000, respectively. When Hurst Diamond Shop received a cashier's check, the practice was to debit the cash account and credit the "cashier's check account." The cashier's check in the amount of $15,000 involved herein did not appear in said account. Respondent did not include the cashier's check in the amount of $15,000 as an asset on his net worth statement of Hurst Diamond Shop, or of Ben individually, for the years 1945, 1946, and 1947, inclusive. See Schedule C, supra. Opinion - Cashier's Check ($15,000) Petitioners contend that at the end of calendar year 1945 they had a credit balance of $15,000 in "cashier's checks" which respondent failed to include as an asset on his net worth schedule for Hurst Diamond Shop for the calendar years ending 1945, 1946, and 1947. They argue that during 1945, Ben had a "personal cash *317 reserve" in the amount of $90,000, and that he used $15,000 thereof to pay off a business indebtedness evidenced by two notes (in the amounts of $8,000 and $7,000, respectively) payable to Merchants Bank, Kansas City, Missouri, and recorded as paid on the books of Hurst Jewelry and Loan Company. There is no acceptable evidence that Ben used his "personal cash reserve" to pay said indebtedness (although there is evidence which satisfies us that he used part of such reserve to purchase a cashier's check for the same amount). Ben himself did not testify with respect to the particular transaction, and we think the argument made on his behalf in this connection is merely part of the rationalization to the effect that he had accumulated $90,000. It does appear from the accountant's testimony that a $15,000 business indebtedness to the Merchants Bank had been paid off in 1945 without cash funds having been withdrawn from the company, but it is more reasonable to infer that the cashier's check for $15,000 was used for this purpose rather than cash from Ben's reserve. Such evidence as there is in the record would indicate that the cashier's check was used for this purpose. It appears that the *318 "Notes Payable - Merchants Bank" account as of the end of 1945, in the aggregate amount of $38,000, as determined by respondent, does not include the two notes in the total amount of $15,000 which the accountant testified were paid during 1945. See Schedule C, supra. The effect of respondent's determination, therefore, was to eliminate both the asset (the cashier's check) and the liability (the two notes totaling $15,000). From the record, as we see it, this was appropriate. In any event, petitioner has failed to meet the burden of proving error. Moreover, we see no occasion to set up a liability from the business to Ben individually (arising out of the use of the cashier's check) because such a course, for net worth purposes, would correspondingly increase Ben's personal assets to the extent of any so-called indebtedness from the business to him. In the light of the foregoing, if we were required to decide the issue on the merits, we would sustain respondent, as above indicated, because of petitioners' failure to meet the burden of proof. There is no occasion for so holding, however, since we have held that the years affected are barred by limitations. Findings - Max Krashin (Hurst *319 Diamond Shop Liabilities) Respondent determined that Hurst Diamond Shop owed Max Krashin (the father of Sarh Hurst) the sum of $10,000 at the end of calendar year 1947; the sum of $13,000 at the end of 1948 and 1949, respectively; and zero dollars at the end of 1950. See Schedule D, supra. The parties stipulated that the aforesaid amounts are erroneous and that the correct amounts owed Krashin are as follows: Date
Amount
December 31, 1947
$10,000.00
December 31, 1948
27,100.00
December 31, 1949
25,600.00
December 31, 1950
10,000.00
The parties also stipulated that the insurance proceeds in the amount of $708.07 received by Sarah Hurst in 1949, by virtue of her father's death, would be eliminated from income for that year. Opinion - Max Krashin (Hurst Diamond Shop Liabilities) Petitioners contend that respondent's adjusted computation, reflecting the aforementioned stipulations, results in a net loss of income to petitioners for the taxable year 1949. It is petitioners' view that the difference between the indebtedness to Max Krashin as of the end of 1949 in the amount of $13,000, as determined by respondent in his statutory notice, and the stipulated amount of $25,600, decreases taxable income *320 of Hurst Diamond Shop in the amount of $12,600, and that when said amount is added to the insurance proceeds in the sum of $708.07 received by Sarah in 1949, the adjusted gross income attributed by respondent to petitioners is reduced from $6,940.95, as determined by respondent in his statutory notice, to a net loss in the amount of $6,367.12 for 1949. Petitioners arrived at said loss by deducting the stipulated deductions in the amount of $13,308.07 from the adjusted gross income for 1949 in the amount of $6,940.95. In essence, petitioners urge that by stipulation there was an "addition of liabilities of $12,600" for the taxable year 1949, which decreases income for said years by that amount. Respondent, on the other hand, maintains that said stipulation increases income of Hurst Diamond Shop in the amount of $1,500, i.e., the difference between the account payable at the end of calendar years 1948 and 1949 or $27,100 and $25,600, respectively, and hence that his adjusted computation for 1949 does not show a net loss of income to petitioners for 1949. We agree with respondent. It is apparent that petitioners have improperly computed the difference between the amount owed to Krashin, *321 as determined by respondent in his statutory notice as of the end of calendar year 1948, i.e., $13,000, and the stipulated amount as of the end of 1949. The record is clear that the sum of $13,000 was superseded by the stipulated amount of $27,100, and that Hurst Diamond Shop, in reducing said liability during the calendar year 1949 in the amount of $1,500, in effect, increased net worth in that amount. It is thus clear that the stipulation relating to the liabilities to Krashin did not result in the net loss in 1949 claimed by petitioners. In view of our holding, we likewise reject petitioners' contention, on brief, that by virtue of the aforesaid stipulation relating to the correct amount owed to Krashin, they are entitled to a net operating loss carry-back or net operating loss carryforward in the amount of $6,477.43. In passing, we note that the stipulated adjustments in the account payable to Max Krashin during the taxable years ending December 31, 1947 through 1950, increases the liabilities of Hurst Diamond Shop accordingly, and will therefore decrease the "Investment, Ben and Sarah Hurst" account in respondent's net worth schedule for Hurst Diamond Shop. These adjustments are *322 reflected on our revised net worth schedule relating to Ben and Sarah Hurst. See Schedule G. Opinion - B & S Realty Company Income Increased In the notice of deficiency in Docket No. 56867, in which respondent determined deficiencies against Ben Hurst, individually, he included a supporting schedule denominated Exhibit F ("Income of Sarah Hurst") as follows: 1945
1946
1947
Adjusted Gross In-
come Reported
$5,268.61
$6,513.57
$6,770.96
B & S Realty Co. In-
come Increased
0
364.77
758.30
Total
$5,268.61
$6,878.34
$7,529.26
The aforesaid totals of gross income of Sarah were then deducted by respondent from the total gross income of Ben and Sarah determined on the net worth basis (Exhibit A, attached to deficiency notice in Docket No. 56867) to arrive at the adjusted gross income of Ben, individually, for said years. See Schedule I, supra. By stipulation, the respective amounts of $364.77 for 1946 and $758.30 for 1947 were corrected to show, respectively, the amounts of $231 and $308.09. The actual dispute arose originally over the question of whether Sarah's assets were to be taken into consideration in determining Ben's net worth for the years in question. This dispute, for practical purposes, was disposed *323 of by later oral stipulation. In addition, we have determined that the years in question are barred by limitations. The issue, therefore, becomes moot, except that, for purposes of clarification, we have included the correct amounts of $231 and $308.09 in our revised net worth statement. Findings - Unallowable Deductions: Sanctions, National Labor Relations Board; Capital Loss in Excess of Maximum; Loss on Sale of Personal Residence The parties stipulated that the amount and classification of "Unallowable Deductions" in respondent's computations was correct, i.e., Sanctions, National Labor Relations Board ( $650) in 1945; capital loss in excess of maximum ($8,701.94) in 1946; and loss on sale of personal residence ($4,000) in 1947. The parties are in agreement as to the amounts to be used for "personal expenses and unallowable deductions" for the years 1948, 1949, and 1950. Petitioners, on brief, concede respondent's treatment of an "unallowable deduction" in 1945 for "Sanctions, National Labor Relations Board," in the sum of $650, as correct because it represents an actual cash outlay of money and was claimed as a deduction on the 1945 income tax return. Petitioners claimed the following *324 longterm capital loss on the sale of Hurst Manufacturing Company stock on their income tax returns for the years 1946, 1947, and 1948: Ben
Sarah
Capital loss claimed on
return
for 1946
$4,900
$5,100
Long-term capital loss - 50%
recognized
2,450
2,550
Amount claimed as a deduction
on 1946 return
1,000
1,000
Amount claimed as a deduction
on 1947 return
1,000
1,000
Amount claimed on 1948 joint
return
$1,000 On his 1946 return, Ben claimed, as a page 3 deduction, a loss of $701.94 for amounts "advanced" to the Hurst Manufacturing Company and not repaid. Respondent determined that petitioners sustained a total long-term capital loss of $10,701.94 (only 50 per cent of which may be recognized) on the liquidation of the Hurst Manufacturing Company in 1946, and allowed petitioners a deduction of $2,000 of this amount in 1946. The aforesaid amount of $10,701.94 consisted of petitioners' aggregate stock interest of $10,000 (the sums of $4,900 and $5,100 owned by Ben and Sarah, respectively), and the sum of $701.94 "advanced" to the corporation by Ben. After the allowance of a capital loss deduction of $2,000 in 1946, respondent treated the balance of $8,701.94 as an unallowable deduction in computing petitioners' *325 increase in net worth for the taxable year 1946. Respondent allowed petitioners capital loss carry-over deductions of $2,000 for 1947, $1,000 for 1948, and $701.94 for 1949. In 1947, petitioners sold their personal residence located at 3335 Benton and sustained a loss thereon in the amount of $4,000. Respondent determined the entire amount to be an unallowable loss. Opinion - Unallowable Deductions Petitioners concede, on brief, that respondent's view of the sanctions imposed by the National Labor Relations Board ( $650) is correct, but contest his treatment of the capital loss in the amount of $8,701.94 in 1946 and the loss on the sale of their personal residence in the amount of $4,000 in 1947 as "unallowable deductions," which respondent added to "personal expenses" in computing petitioners' net worth for said years. Specifically, with respect to the capital loss of $10,701.94, petitioners urge that although an aggregate amount of $5,701.94 in loss carry-overs was allowed over a 3-year period by respondent, the amount, treated as an unallowable deduction for 1946, resulted in an erroneous increase in net worth for that year. With reference to the "loss on *326 the sale of personal residence," petitioners challenge respondent's addition to "personal expense" in 1947 of the sum of $4,000, arguing that at no time did either of petitioners, separately or jointly, ever claim said loss as a deduction and that no expenditure of $4,000 occurred. Petitioners maintain that respondent's treatment of said items is arbitrary and constitutes a misapplication of the net worth plus expenditures technique of reconstructing taxable income. In essence, petitioners aver that the disposition of said items during 1946 and 1947 at a loss resulted in a "shrinkage" of assets during the net worth period and therefore should be deducted from, rather than "added back" to, respondent's net worth plus expenditures computation for those years. It is their position that only nondeductible expenditures may be added to the increases to net worth, and that the amounts of the unallowable deductions, which in themselves do not involve expenditures of money, cannot be added to the increases in net worth. We find no merit in petitioners' view. Petitioners concede that where net worth increase is the income determinant, respondent may, in making the final computation upon which *327 to base the tax, add to the increase all identified personal expenses, estimated cash expenditures, and unallowable deductions for which money was actually expended (based on the theory that such expenditures were made from current income), but respondent may not add back losses actually sustained for which no tax deduction was claimed and for which no money was expended in order to arrive at the base upon which the tax is to be assessed. The fallacy in petitioners' argument is that the assets were properly includible in net worth at petitioners' basis, and that, but for the disposition of the assets in the years in question, such assets would have remained as assets in the net worth computation. Upon disposition thereof, it became necessary, therefore, to make appropriate adjustments to counterbalance the losses for which petitioners are not entitled to any deduction in order to reconstruct petitioners' correct taxable income for the net worth period in question. Although petitioners' net worth was in fact decreased when the assets in controversy were disposed of at a loss, if no adjustment were to be made to reflect and balance such losses in computing net worth increase, taxpayers *328 would receive the benefit of an unallowable loss deduction as if the loss were in fact allowable. It is clear that petitioners are not entitled to such a benefit. Again we add that we have held that the years in question are barred by limitations, and the adoption of respondent's view is not harmful to petitioners. Opinion - Federal Income Tax and Other Personal Expenses and Unallowable Deductions Respondent, in his computation of "personal expenses and unallowable deductions," attached to the notice of deficiency of Ben for the taxable years 1945, 1946, and 1947, included Federal income taxes paid by both Ben and Sarah for those years in the respective amounts of $8,869.86, $2,505.76, and $3,274.99. With respect to these disputed items, petitioners urge that said amounts are erroneous because they include Federal income taxes paid by Sarah (who is not a party in the proceedings in Docket No. 56867) on her separate returns. As noted hereinabove, respondent determined that Sarah's assets were to be included in the computation of Ben's net worth for the years 1945-1947, inclusive. Therefore, in order to reflect Ben's income for the years in question, respondent used the combined assets *329 of petitioners, and, consistent with this approach, added back the total Federal income taxes paid by each in making his determination. To eliminate any distortion of income in arriving at the understatement of income of Ben for those years, the "adjusted gross income as reported" by Sarah was then subtracted from the combined adjusted gross income of petitioners. Counsel for petitioners, at the end of the trial, agreed to the combination of petitioners' assets if the use of the net worth method was approved by us in the instant case. We have held that it was appropriate for respondent to use the net worth technique, and respondent has made proper allowance for the inclusion of Sarah's assets and nondeductible expenditures by deducting her adjusted gross income as reported. We hold respondent's approach to be correct, and accordingly sustain him on this issue. Our conclusion is the same, and for the same basic reasons, with respect to petitioners' contention that the amounts and classifications set forth in respondent's computation of "personal expenses and unallowable deductions" for the years 1945-1947, inclusive, in Docket No. 56867, are incorrect insofar as they include any personal *330 expenses paid by Sarah. We call attention to the fact that we have held that the years 1945 to 1947, inclusive, are barred by limitations. Findings - Fraud Issue During the taxable years 1946 to 1950, inclusive, Ben submitted financial statements to the City National Bank and Trust Company of Kansas City, Missouri, in order to obtain loans. See findings of fact relating to cash on hand. Ben stated therein that the sales of Hurst Diamond Shop for the years 1946 and 1947 were $250,000 and $300,000, respectively. He reported sales on his income tax returns for those years in the respective amounts of $95,484.57 and $162,479.73. Likewise, he indicated on the financial statements that he had realized net profits on sales for the years 1946 and 1947 in the respective amounts of $20,000 and $30,000, and reported on his returns for those years net profits from his business of $468.60 and $5,274.51, respectively. For other pertinent facts see findings supra covering items in dispute relating to determination of deficiencies. Opinion - Fraud Issue Respondent contends that the return filed for each of the years 1945 through 1950 was false or fraudulent with intent to evade tax within the meaning *331 of section 276(a), and also that a part of the deficiency determined for each of these years was due to fraud with intent to evade tax within the meaning of section 293(b). The burden of proof with respect to fraud is upon the respondent, and he must prove fraud on the part of petitioners by clear and convincing evidence. W. A. Shaw, 27 T.C. 561 (1956), affd. 252 Fed. (2d) 681 (C.A. 6, 1958); Arlette Coat Co., 14 T.C. 751 (1950). We believe respondent has failed to meet his burden of proof of fraud for any of the years involved herein. While we have found that there were understatements of income in each of the years in question, our conclusions are based, in material respects, upon petitioners' failure to meet their burden of proof, as will appear from our discussions supra of the issues relating to deficiencies. We note in this context that if we had accepted the testimony to the effect that Ben's "personal cash hoard" was $90,000, the understatements which we have found would have been substantially reduced. Our failure to find this as a fact on issues in which petitioners have the burden is not equivalent to an affirmative finding on the fraud issue (on which the burden rested *332 with respondent) that Ben did not have such a hoard. None of the items expressly questioned by respondent appear to have been tainted with fraud and respondent has proved no wilfully false statements on petitioners' returns. Some items are unexplained, but failure of memory after the passage of so many years is hardly to be taken as unexpected. It has been held in prior cases that the failure of a taxpayer to overcome the presumptive correctness of respondent's determination of deficiencies cannot, of itself, be regarded as affirmative proof of such deficiencies, or that any part thereof was due to fraud. See, for example, Drieborg v. Commissioner, 225 Fed. (2d) 216 (C.A. 6, 1955). Likewise, a mere understatement of income, in itself, does not establish fraud. The existence of fraud with intent to evade taxes must be affirmatively proved by respondent. James Nicholson, 32 B.T.A. 977 (1935), affd. 90 Fed. (2d) 978 (C.A. 8, 1937). Respondent failed to prove the omission of any specific item of income in the returns for the years 1945 through 1950. The revenue agent testified on cross-examination that she could not recall finding any defalcations in the books and records of the Hurst *333 Diamond Shop, or that any claims for deductions on petitioners' returns had been overstated in substantial amounts. Likewise, there is no evidence in the record of any concealment of assets, covering up of sources of income, or any conduct, the likely effect of which would be to mislead or conceal. See Spies v. United States, 317 U.S. 492 (1943). There is clearly no direct evidence of fraud in this case. As to each of the years in question, respondent bases his contention of fraud on the amounts of the understatements (which he has failed to prove by affirmative evidence), the absence of adequate records of various transactions, and personal expense items in excess of taxable income reported by petitioners in all of the years except 1950. Respondent also emphasizes discrepancies between the amounts of business net profit as set forth in Ben's financial statements to banks as compared to the amounts reported on his returns for the years 1946 and 1947. Although our suspicions are aroused by the foregoing circumstances, there is no tangible evidence to support the view that the financial statements were true and the returns false. The evidence of the examining agent tends rather to prove *334 the contrary, at least with respect to the amounts of sales. We likewise face the fact that the issue with respect to Ben's "personal cash reserve" is a doubtful one on the question of fraud, with respect to which, as we pointed out above, the burden is on respondent. We recognize, of course, that in this, as in many fraud cases, the proof of fraud, if it is to be established, must depend largely upon circumstantial evidence, but such circumstantial evidence, taken together with all other facts in the record, must point clearly and convincingly to fraud. Gross negligence is not the equivalent of fraud. "Fraud implies bad faith, intentional wrongdoing, and a sinister motive. It is never imputed or presumed. Mere suspicion of fraud and mere doubts as to the intentions of the taxpayer are not sufficient proof of fraud." L. Glenn Switzer, 20 T.C. 759 (1953), remanded by stipulation (C.A. 9, 1954), and cases cited therein. In the light of the foregoing, and the record as a whole, we have concluded that respondent has not sustained his burden of proving that a part of the deficiency for any of the years 1945 through 1950 was due to fraud with intent to evade taxes within the meaning of *335 section 293(b). Accordingly, the additions to tax proposed by respondent under section 293(b) are disallowed. The question of limitations where fraud is an issue under section 276(a) has been disposed of accordingly. Decisions will be entered under Rule 50. Footnotes
*. Respondent's net worth statement (Exhibit B) in Docket No. 56866 does not show any totals for the net worth period involved.↩
*. These items should each be reduced by $500 to correct error in adding the total asset figure.↩
*. Includes the amount of $7,065.61 for items designated sales, repairs, postage ($2,437.66), interest received ($4,627.95), and other income ($669.98). ↩
**. Includes the amount of $5,682.69 for items designated sales, repairs, postage ($4,037.75), interest received ($1,644.94), and other income ($2,307.99).↩
1. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. * * *
(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.↩
2. SEC. 276. SAME - EXCEPTIONS. * * *
(b) Waiver. - Where before the expiration of the time prescribed in section 275 for the assessment of the tax, both the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.
*. Petitioners' son, Alvin, received one-third of the profits from the pawnbroking business per agreement.↩
*. Adjusted gross loss reported; no page 3 deductions were disclosed on the 1949 return.↩
3. Q. Were you in the habit of keeping a lot of cash on hand or did you keep it all in the business? Were you in the habit of keeping cash on hand for your personal use? A. I always had cash on hand. Q. What amount did you usually retain then? A. That I couldn't tell you. Q. Approximately $1,000.00, $2,000.00? A. O, God, yes. Q. How much? A. I can't remember how much it was. Q. It was sometimes large amounts? A. Yes, it was. Q. (By Special Agent Pizzichino): What do you mean by "large"? A. Well, I just don't know what you mean. Q. It might be large for me and small for you. John Ross interrupted and asked: Would it be in excess of $10,000.00? A. O, God, yes. Q. (By Special Agent Bell): What is the largest amount of money kept on hand at any one time? A. I never counted it. I don't remember exactly how much. I never counted the money at all. Q. Couldn't you give us an approximate figure of what would be the most? A. It was considerable money I always carry. * * *
Q. (By John Ross): Did you sometimes have more when you sold things back in the early years and disposed of your investments, and had as much as $15,000.00? A. Yes. Q. (By John Ross): Did you have as much as $25,000.00? A. Yes. Q. Did you ever have an excess of $25,000 on hand? Did you ever at one time have in your possession, not in bank accounts, cash in excess of $25,000.00? A. Yes, sir. Q. You couldn't state whether you ever had as much as $50,000.00 in the safe or not? A. I can't answer that, I can't remember, I never counted it. Q. Did anybody else have knowledge of this money that you kept in the safe? A. No, sir. Q. (By John Ross): I want to be sure you understand that. Were there any other people who knew you kept money in the safe? A. Yes, I imagine they did know I had money there. Q. (By Arthur Ross): But they didn't know the amount? A. No, sir, not even my wife knew that. * * *
Q. Mr. Hurst, concerning the amount of money you claim to have on hand in store in your safe - let's say about 1948, could you give us an idea of approximately what you think you had on hand. Did you have as much as $50,000.00 on hand at the beginning of 1948? A. So help me, God, I can't remember. Q. You couldn't even get within $20,000.00 of it? A. I can't remember, I never counted it, it was considerable. Q. How do you know it was considerable if you didn't count it? A. I see a bundle there, it could be a bundle of 1's -.↩
4. Petitioners' figure is apparently in error since the two amounts allegedly paid to Akridge in 1945 and 1946 by petitioners total $25,299.09 rather than $25,309.09, as stated on brief.↩